UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

E.G., individually and as parent and natural    :
guardian of A.I. and L.I., minor children;    :    Index No. _____
M.M., individually and as parent and natural    :
guardian of E.H., L.H., Ev.P., and E.P.,    :
minor children; O.M., individually and as    :
parent and natural guardian of A.M., a minor    :
child; and COALITION FOR THE    :
HOMELESS, on behalf of themselves and    :
all others similarly situated,    :
   :
               Plaintiffs,    :
   :
    -against-    :    **<u>CLASS ACTION COMPLAINT</u>**
   :
THE CITY OF NEW YORK; NEW YORK    :
CITY DEPARTMENT OF EDUCATION;    :
RICHARD A. CARRANZA, as Chancellor of    :
the New York City Department of Education;    :    **DEMAND FOR JURY TRIAL**
NEW YORK CITY DEPARTMENT OF    :
SOCIAL SERVICES; STEVEN BANKS, as    :
Commissioner of the New York City    :
Department of Social Services; NEW YORK    :
CITY DEPARTMENT OF HOMELESS    :
SERVICES; JOSLYN CARTER, as    :
Administrator of the New York City    :
Department of Homeless Services; NEW    :
YORK CITY HUMAN RESOURCES    :
ADMINISTRATION; GARY JENKINS as    :
Administrator of the New York City Human    :
Resources Administration; NEW YORK    :
CITY DEPARTMENT OF INFORMATION    :
TECHNOLOGY AND    :
TELECOMMUNICATIONS; and JESSICA    :
TISCH, as Commissioner of the New York    :
City Department of Information Technology    :
and Telecommunications,    :
   :
               Defendants.    :
   :

---------------------------------------------------x

## PRELIMINARY STATEMENT

1.      This action seeks to vindicate the rights of homeless children residing in New York City shelters to receive a sound basic education during the COVID-19 pandemic.

2.      The pandemic has transformed the school experience for New York City's children.  Since the virus necessitated the repeated shutdown of school buildings, attending school has not meant walking through a schoolhouse door every day.  It has meant that every student is required to enter a "virtual classroom" by logging onto a tablet, computer, or other electronic device anywhere from one to five days per week.  Once connected by videoconference, children see their teachers and classmates.  Class is called to order and attendance is taken.  Teachers jump into their lesson plans.  Students raise their hands to answer questions or pose questions of their own.  Classwork and homework are completed electronically and submitted through online platforms.  The educational experience is imperfect, but it is still school.

3.      The children of Plaintiffs E.G., M.M., and O.M.[1] have been denied this experience.  So have thousands of other students residing in shelters throughout New York City.  They lack access to the kind of reliable internet that would enable them to participate meaningfully in school—indeed, to enter school at all—because the City has failed to provide it.

4.      The City's failure was perhaps understandable at the outset of the pandemic.  The rapid onset of the COVID-19 pandemic plunged the City and its educational system into chaos.  The abrupt closure of schools forced teachers and students alike to transition to remote

---

[1] Plaintiffs (other than Coalition for the Homeless) are identifying themselves in this pleading and all other public filings in this case through initials only.  These Plaintiffs are parents of minor children, all of whom are homeless as defined by the McKinney-Vento Act Homeless Assistance Act (the "McKinney-Vento Act").  *See* 42 U.S.C. § 11434a(2).  The McKinney-Vento Act, and the Family Education Rights and Privacy Act incorporated therein, protect the privacy rights of homeless children.  *See* 42 U.S.C. § 11432(g)(3)(G); 20 U.S.C. § 1232g(b); *see also P.M. v. Evans-Brant Cent. Sch. Dist.*, 2008 WL 4379490, at *3 (W.D.N.Y. Sept. 22, 2008) ("[S]ince a parent must proceed on behalf of a minor child, the protection afforded to the minor would be eviscerated unless the parent was also permitted to proceed using initials.").

learning with essentially no preparation.  And the City made some initial efforts to provide children residing in shelters with technology to facilitate their attendance in the virtual classroom.

5.      For months, however, it has been clear that the City's initial efforts have fallen short. With no reliable internet service for residents at numerous shelters throughout the City, Plaintiffs' children have routinely been unable to connect to their virtual classroom and participate in school. The City's ongoing failure to provide Plaintiffs and other members of the Class (as defined in paragraph 116 below) with reliable internet access—eight months into the pandemic—violates the law and requires legal redress in the form of an injunction.

6.      The New York Constitution guarantees a "sound basic education" for each and every child living in the state.  N.Y. Const. art. XI, § 1; *see also Campaign for Fiscal Equity, Inc. v. New York*, 655 N.E.2d 661, 665 (1995).  New York statutory law further ensures that indigent children such as Plaintiffs receive the necessary tools for attendance at school.  N.Y. Educ. L. § 3209(7).

7.      Federal law provides additional, independent protections.  Through the McKinney-Vento Act, Congress sought to eradicate the barriers to education that arise when a child suffers from homelessness and to ensure that homeless children can enroll in, attend, and succeed in school.  42 U.S.C. §§ 11431-11435.  The Fourteenth Amendment to the U.S. Constitution commands the same result by guaranteeing the equal protection of the laws, including in the realm of education.  U.S. Const. amend. XIV, § 1.

8.      The City's ongoing failure to provide reliable internet service at shelters throughout the City violates each of these constitutional and statutory obligations.  Indeed, the Mayor of New York has publicly admitted that reliable internet access is a necessity at all shelters, declaring that he has instructed City officials to begin installation of "WiFi"—that is, wireless internet access via routers or access points that are connected to a building's wired internet connection—in all of the

City's shelters.  But City officials have refused to articulate any clear timeline for meeting this directive.  Instead, they have stated vaguely that WiFi installation will be complete at some shelters "this winter," and at the vast majority of the City's other shelters *in the summer of 2021*—that is, after the current school year is over.  And the same officials have described this unacceptable result as an "aggressive goal," suggesting doubts that it will actually be achieved.

9.     Ultimately, an education delayed is an education denied.  It is neither acceptable nor lawful to require Plaintiffs and other Class members to accept a lack of genuine access to the virtual classroom for most, if not all, of the 2020-21 school year.  This is especially so now that the City, just days prior to the filing of this lawsuit, has indefinitely suspended in-person education across the City's public schools due to increases in positive COVID-19 cases.  Plaintiffs accordingly seek, by this class action, expedited redress for the City's ongoing violation of its constitutional and statutory duties to provide the basic educational access the City's most vulnerable residents have been persistently denied since the outset of the pandemic.

## JURISDICTION AND VENUE

10.     Jurisdiction and venue are proper in this Court.

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, on the ground that this action arises under the laws of the United States.

12.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiffs' claims of violations of the New York Constitution, Article XI, § 1, and New York State Education Law § 3209.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), on the ground that each of the Defendants resides in this District.

## PARTIES

14.    Plaintiff E.G. lives in a DHS-run family shelter in Harlem.  She is a single parent of four children and a survivor of domestic violence.  E.G.'s children, A.I. and L.I., are enrolled in DOE elementary and middle schools, respectively, in Manhattan, while the youngest are too young to enroll in school.  Since March 2020, when full-time in-person schooling was shut down in New York City, E.G.'s children have attended school remotely using the devices provided to them by DOE.  When given the option of sending her children to school for part-time, in-person learning in September, E.G. chose to keep them home because she did not want to risk exposing them to the virus.

15.    Plaintiff M.M. lives in an HRA-run domestic violence family shelter.  Four of Plaintiff's five children, E.H., L.H., Ev.P., and E.P., attend the same DOE school in Manhattan.  M.M. is a survivor of domestic violence and lives alone in a shelter with her five children.  Since March 2020, when full-time in-person schooling was shut down in New York City, M.M.'s children have attended school remotely using the devices provided to them by DOE.

16.    Plaintiff O.M. lives in a DHS-run shelter in Brooklyn with his wife and son, A.M.  A.M. is enrolled as a student in a DOE public school.  A.M. attended a middle school across the street from the family's shelter at the beginning of the pandemic.  Since March 2020, A.M. has been accessing his education through remote-only learning due to O.M.'s medical conditions, which put him at risk for severe complications if he were to contract COVID-19.

17.    Plaintiff COALITION FOR THE HOMELESS is a not-for-profit organization focused on advocating for, and providing services to, homeless individuals and families in New York City.

18.   Defendant THE CITY OF NEW YORK ("New York City" or the "City") is a municipality of the State of New York, and is responsible for, among other things, providing a sound basic education to the children of New York City, including Plaintiffs and other Class members.

19.   Defendant NEW YORK CITY DEPARTMENT OF EDUCATION ("DOE") is an agency of New York City.  DOE has control over educational matters affecting students in New York City, and is responsible for the general supervision and management of the City's public schools.  DOE is responsible for ensuring its schools comply with federal, state, and local laws.

20.   Defendant RICHARD A. CARRANZA is the Chancellor of DOE.  Defendant Carranza is responsible for the day-to-day operations of both DOE and all New York City public schools.  Defendant oversees the education of approximately 1.1 million students in over 1,800 schools throughout New York City, including those students residing in the City's shelters.  Defendant Carranza has developed DOE's policies and plans to address the COVID-19 pandemic and its impact on New York City's public schools.  Defendant Carranza is sued in his official capacity.

21.   Defendant NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES ("DSS") is an agency of New York City.  DSS is responsible for the majority of the City's social services programs, including oversight and management of the New York City Human Resources Administration and the New York City Department of Homeless Services.

22.   Defendant STEVEN BANKS is the Commissioner of DSS.  Defendant Banks is responsible for the day-to-day operations of DSS, which include, among other things, oversight and management of DHS and HRA.  Together with Defendants Carter and Jenkins, Defendant

Banks has developed policies for DHS and HRA and plans to address the COVID-19 pandemic and its impact on New York City's shelters.  Defendant Banks is sued in his official capacity.

23.     Defendant NEW YORK CITY HUMAN RESOURCES ADMINISTRATION ("HRA") is an agency of New York City.  HRA provides services to indigent New Yorkers by providing food assistance, rental assistance, and other benefits, and is responsible for managing the City's domestic violence shelters.  HRA operates approximately 55 domestic violence shelters throughout New York City.  On information and belief, approximately 50 of these shelters house individuals with children.

24.     Defendant GARY JENKINS is the Administrator of HRA. Defendant Jenkins is responsible for the day-to-day operations of HRA, which include, among other things, administering the City's domestic violence shelter system for homeless adults and families with minor children.  Defendant Jenkins oversees approximately 55 confidential shelters, which house 2,514 emergency beds.  Together with Defendant Banks, Defendant Jenkins has developed HRA's policies and plans to address the COVID-19 pandemic and their impact on New York City's domestic violence shelters.  Defendant Jenkins is sued in his official capacity.

25.     Defendant NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES ("DHS") is an agency of New York City.  DHS provides services to the City's homeless and is responsible for managing the City's shelters.  DHS operates approximately 450 shelters throughout New York City.  On information and belief, 247 of these shelters house families with children.

26.     Defendant JOSLYN CARTER is the Administrator of DHS.  Defendant Carter is responsible for the day-to-day operations of DHS, which include, among other things, administering the City's shelter system for homeless adults and families.  Defendant Carter oversees approximately 450 New York City shelters, 247 of which house nearly 10,000 homeless

families.  Together with Defendant Banks, Defendant Carter has developed DHS's policies and plans to address the COVID-19 pandemic and their impact on New York City's shelters. Defendant Carter is sued in her official capacity.

27.  Defendant NEW YORK CITY DEPARTMENT OF INFORMATION TECHNOLOGY AND TELECOMMUNICATIONS ("DoITT") is an agency of New York City. DoITT is responsible for the sustained, efficient, and effective delivery of information technology services, infrastructure, and telecommunications to residents of New York City.  DoITT oversees the City's use of existing and emerging technologies in its delivery of services to the public and helps facilitate the technology needs of other New York City agencies.

28.  Defendant JESSICA TISCH is the Commissioner of DoITT.  Defendant Tisch is responsible for the day-to-day operations of DoITT, which include, among other things, providing for the delivery of IT services, infrastructure, and telecommunications to New York City residents. Together with Defendants Banks, Carter, and Jenkins, Defendant Tisch is responsible for the provision, installation, and maintenance of internet services at the City's shelters.  Defendant Tisch is sued in her official capacity.

29.  Defendants New York City, DOE, DSS, DHS, HRA, DoITT, Carranza, Banks, Jenkins, Carter, and Tisch are referred to herein as "Defendants."

30.  Defendants have, at all relevant times, been acting or purporting to act under color of the law of the State of New York.

## **FACTUAL BACKGROUND**

### I.  **COVID-19 Forces New York City Schools to Close**

31.  In or around December 2019, COVID-19, an acute respiratory disease caused by the novel coronavirus SARS-CoV-2, began spreading in various locations around the world,

principally China and Europe.  COVID-19 has spread to 215 countries and territories since its initial emergence.  As of the time of this filing, more than 12 million people have contracted COVID-19 and more than 550,000 people globally have died from it.  So far, there is no readily available vaccine or effective anti-viral treatment for COVID-19.

32.    On January 21, 2020, the U.S. Centers for Disease Control and Prevention confirmed the first case of COVID-19 in the United States.  Shortly thereafter, on January 30, 2020, the World Health Organization declared a global health emergency, identifying COVID-19 as a "public health emergency of international concern."  The next day, the U.S. government declared the COVID-19 outbreak a public health emergency.

33.    As the number of COVID-19 cases shot up globally in March 2020, the New York City metropolitan area became the epicenter of the outbreak in the United States.  On March 1, 2020, New York State confirmed its first COVID-19 case.  Days later, on March 3, 2020, a second case of the virus was confirmed in Westchester County.  By March 31, 2020, New York State reported 75,795 COVID-19 cases and 1,550 deaths.

34.    On March 15, 2020, Mayor de Blasio ordered the New York City public schools to shut down in response to the pandemic.  More than one million students in the City's public schools, including the estimated 114,000 homeless students who attend those schools,[2] were required to continue their education remotely.  Teachers and students quickly shifted from traditional in-person classroom learning to an entirely online program, as best as they were able.

35.    When the City's public schools moved entirely online, DOE made plans to provide remote instruction to students.  DOE created an online platform through which students could

---

[2] The McKinney-Vento Homeless Assistance Act requires that public schools ask incoming students about their housing status; at the end of last year, New York City reported that 114,000 school-aged children met the McKinney-Vento definition of homelessness: lacking a "fixed, regular and adequate nighttime residence."  42 U.S.C. § 11434a(2).  Not all 114,000 school-aged children live in a homeless shelter.

access their remote classes.  When online, students would participate virtually with their instructors and classmates, download homework and other assignments, and obtain other educational resources while not in the physical classroom.  An effective and reliable internet connection was thus necessary to attend and participate in school.

36.   In March 2020, aware that the dramatically increased importance of internet access would erect an educational barrier to the City's underprivileged children, Defendant Carranza announced the City's plan to distribute iPad devices to students in need.  Defendant Carranza stated that students residing in shelters would be prioritized.

37.   DOE eventually distributed over 300,000 devices to New York City students who did not have a device at home that would allow them to attend class virtually.

38.   DOE also contracted with T-Mobile, a provider of cellular technology services, to equip the devices with cellular plans that would enable them to connect to the internet, assuming adequate cellular service where the device is located.

## II.   COVID-19's Impact on Homeless Children's Education

39.   Even prior to the COVID-19 pandemic, children residing in shelters faced significant challenges.  For these children, school provides an essential source of stability, offering not only an education, but also meals, physical and mental health services, and a support network of teachers and administrators.

40.   When the City's education program moved to a remote format, many students, especially students living in shelters, were left without the necessary technology to access their classes.  While DOE reacted by distributing iPad devices equipped with cellular plans, problems with that solution quickly emerged and have yet to be remedied.

41.     As early as March 26, 2020, reports emerged that children residing in shelters were consistently unable to access their remote classes.  The problems were twofold.  First, the T-Mobile cellular service provided with the iPad devices distributed by DOE was plagued by rampant "dead zones."  At the Flatlands Family Residence in Brooklyn, for example, T-Mobile's services did not provide sufficiently robust cellular coverage to enable reliable access to the internet.  Second, at the Flatlands shelter and many others throughout the City, staff refused or were unable to provide access to existing WiFi networks utilized by shelter staff.

42.     Plaintiffs and other Class members experienced these impediments to school attendance virtually from the outset of the school closures mandated in response to the pandemic.  Plaintiffs reported their children were unable to do simple tasks on the DOE-provided iPads, such as downloading homework.  Spotty service meant that engaging in real-time learning was almost impossible.  Although DOE arranged for a support hotline to assist students and parents with technical support, when Plaintiffs and other Class Members engaged with that hotline, or with shelter staff and school administration, they were unable to address the underlying problem and thus unable to attend school, a right they have under the law.

**Plaintiff E.G.**

43.     Since full-time in-person schooling was shut down in March 2020, E.G.'s children have attended school remotely.  When given the option of sending them to school for part-time, in-person learning in September, E.G. chose to keep them home to avoid exposing them to the virus.

44.     The DOE-provided iPads, however, have not worked consistently, and E.G.'s daughters have been unable to fully participate in school.  E.G. called the DOE support hotline and spoke to staff at her daughters' school, but no one was able to provide long-term solutions.  The shelter staff provided E.G. with the shelter's WiFi password, but the service did not consistently

cover the needs in the family's living space.  E.G. set up a hotspot to connect to the internet by using her cell phone, but only one of her daughters could use it at a time, and the signal was often not strong enough to allow either of her daughters to participate in classes on Zoom, a video platform that requires a significant amount of bandwidth to operate properly.  Additionally, E.G. often ran out of data, which prevented anyone from accessing the hotspot. E.G. was able to obtain computers for her daughters, but, without reliable internet service, her children were still unable to attend school.

45.    Since September, E.G. has called the DOE support hotline between eight and ten times, and her daughters are still unable to reliably connect to the internet to attend school.  DOE has not offered to replace the iPads or the cellular carrier for the iPads.

46.    The elementary school attended by L.I., E.G.'s 11-year-old daughter, has threatened to bring a child protective matter in Family Court against E.G. based on the issues with L.I.'s attendance.  This threat was made despite the fact E.G. is in constant communication with her daughters' schools when they have issues signing into class.  Despite making every effort to engage her children with school, E.G. has been threatened with punishment, and is concerned that her daughters will need to repeat fifth and sixth grade due to the internet access issues plaguing their education during the pandemic.

**Plaintiff M.M.**

47.    M.M.'s four school-age children have been using DOE-provided iPads since March 2020 when school was closed due to the pandemic.  The only way her children can currently attend school remotely is by using the cellular-enabled iPads, as the shelter does not have broadband internet or WiFi.  Despite help from the elementary school's technology teacher, M.M.'s children have never been able to consistently use the iPads.  They are sometimes barely able to find service

long enough to download their homework assignments.  Starting this semester, the schools expected the children to spend more time online participating in live classes via Zoom, which has made the ineffective iPads even less helpful than in the spring.  For example, earlier this month, none of M.M.'s children were able to connect to the internet at any time for two consecutive days.

48.    During a recent parent-teacher conference, M.M. was told that her children had already missed so much instruction that they might have to repeat this year of school.  M.M. was not willing to send her children to school in person; as a single mother of five, contracting COVID-19 presents a heightened risk.

**Plaintiff O.M.**

49.    Plaintiff O.M. lives in a DHS-run shelter in Brooklyn with his wife and son, A.M.

50.    At the beginning of the pandemic, A.M. attended a middle school across the street from the family's shelter.  He has been engaged in remote-only learning since that time due to O.M.'s medical conditions, which put him at risk of severe complications if he were to contract COVID-19.

51.    A.M.'s middle school provided him with a Chromebook computer so he could complete his schoolwork.  However, because the family's shelter does not have WiFi, A.M. had to use O.M.'s cell phone as a hotspot, a solution which worked only intermittently.  A.M.'s school gave him an iPad with cellular service, but it too did not work consistently.

52.    At the beginning of the current school year, A.M.'s new high school provided him with another Chromebook computer, but the family still had to rely on O.M.'s smartphone as a hotspot, which again meant internet access was intermittent.  More recently, DOE provided an iPad with Verizon cellular service, but A.M. is still unable to consistently access the internet; he

loses his internet connection during class at least once a day, and sometimes many times a day.  In addition, the DOE devices block certain websites he needs to access to complete his schoolwork.

53.    Plaintiff O.M. has contacted the DOE support line many times over the past few months, but the issues have not improved.  The shelter staff recently told O.M. that the earliest they will have WiFi access from the shelter is next year.

54.    A.M. has an Individualized Education Plan, which mandates special education services, including specialized instruction, due to his disability.  However, without the ability to consistently engage with this instruction online, O.M. is concerned A.M. will continue to fall further behind.

55.    Plaintiffs' experiences have not been unique.  Upon information and belief, families in shelters across the City have been forced to take drastic measures such as standing outside at the nearest "LinkNYC" sidewalk WiFi kiosk, or sitting in a fast-food restaurant, in order to find a sufficiently reliable internet connection to download schoolwork.  Attending class virtually while standing on the sidewalk or sitting in a restaurant has not been a realistic possibility.

56.    There are more than 200 shelters serving families with children in the DHS system.  According to DHS, most of these shelters do not have WiFi available for residents.

57.    These internet access issues also exist for young adults between the ages of 18 and 21 who are enrolled in public school.  These young adults, some of whom may reside with their parents in the adult family or single adult shelter systems, may also reside in the DHS-run single adult shelter system where they are sharing living space with many other adults.  Although a vast majority of single adults have been moved to hotels to de-densify the congregate shelter settings, they usually share a small room with another adult and are not guaranteed WiFi or internet access to attend school.

58.    There are approximately 50 domestic violence shelters serving families with children in the HRA system.  According to HRA, most of these shelters do not have WiFi available for residents.

### III.    Even with Prior Notice of the Problem, Defendants Fail to Provide Adequate Internet Access in Advance of the 2020-2021 School Year

59.    As early as the spring of 2020, Coalition for the Homeless conveyed its concerns to representatives of DOE and DHS about the lack of adequate internet access for school-age children residing in shelters.

60.    Even prior to the closing of schools in March 2020, DHS indicated to Plaintiff Coalition for the Homeless that it planned to install WiFi at both the Flatlands shelter and the Jamaica Residence, another shelter where families with school-age children have experienced internet connectivity issues.  DHS was notified that, in the course of Plaintiff Coalition for the Homeless's efforts to provide online after-school programming at both residences, it became clear that cellular-based internet service was inconsistent at best at both locations.  On March 20, Plaintiff Coalition for the Homeless and other advocates sent a letter calling for students who are homeless to have access to Regional Enrichment Centers.

61.    In late May 2020, The Legal Aid Society, on behalf of students enrolled in a child care service run by Plaintiff Coalition for the Homeless, contacted DOE-designated technology staff to follow up on support requests that families residing at Flatlands had submitted but had not been addressed.  On June 11, DOE confirmed via telephone its knowledge that many families were unable to connect to the internet.  By July 6, however, the first day of DOE's summer school program, no improvement had been made.

62.     On July 7, 2020, The Legal Aid Society notified DOE's Office of Students in Temporary Housing of the internet connectivity issues at the Flatlands shelter.  In response, DOE indicated that it had received approval that morning from DHS to coordinate a T-Mobile site visit.

63.     In or around the same time, Plaintiff Coalition for the Homeless and The Legal Aid Society jointly alerted DHS to the problems students in its shelters were experiencing with connecting their iPads via the T-Mobile service.  Plaintiff Coalition for the Homeless and The Legal Aid Society continued to raise this issue during weekly calls with DHS throughout the summer in anticipation of the 2020-2021 school year.  Not until August 28, however, did DOE schedule the site visit from T-Mobile that it had promised on July 7.  And even then, technicians only checked signal strength ***outside*** of the building.  Despite T-Mobile's apparent effort that day to "boost" service, nothing improved for families residing in the shelter.

64.     Weekly discussions continued between Defendant DHS, Plaintiff Coalition for the Homeless, and The Legal Aid Society through the summer and into the fall.  Defendant DHS insisted that the iPads previously distributed by DOE were an appropriate solution to the connectivity problem, despite extensive and persistent reports of cellular dead zones.  Defendant DHS declined to assess the feasibility of installing WiFi in the City's shelters, in the face of repeated urging by Plaintiff Coalition for the Homeless.

65.     At no time in the course of these discussions did Defendants contest that some or all of the 2020-2021 school year was likely to be conducted remotely.  Nor did Defendants contest that reliable internet access is a prerequisite to participation in remote schooling.  Nonetheless, despite their knowledge that cellular-based internet service was inadequate, at no point prior to the 2020-2021 school year did Defendants facilitate the installation of WiFi in shelters.  Instead, Defendants offered mere expressions of concern and nothing by way of a concrete action plan to

address the problem.  That failure doomed the upcoming school year to the same connectivity problems that plagued the end of the last one and impeded students from participating in various summer educational programs provided by New York City public schools that are particularly essential to students living in shelters.

66.    On July 8, 2020, Mayor de Blasio announced that New York City's public schools would not fully open for the 2020-2021 school year.  Instead, Defendant DOE announced a "blended" remote learning program for at least the start of the 2020-2021 school year.  Under this model, families could choose whether to have their children attend school solely through remote learning or through a blended program where they would spend one to three days a week at school and attend remotely for the rest of the week.  Although this blended program would allow for some in-person instruction, significant amounts of class time, assignment submission time, and activities would still occur remotely for all students, regardless of their circumstances.

67.    On August 4, 2020, Plaintiff Coalition for the Homeless and other advocates sent a letter calling on Mayor de Blasio to prioritize the educational needs of students who are homeless while planning for the reopening of schools this fall.

68.    On September 16, 2020, Plaintiff Coalition for the Homeless and other advocates sent a letter calling on Mayor de Blasio to develop a coordinated interagency plan to address the barriers that students who are homeless were facing as the school year began.

69.    By the beginning of November 2020, about 75% of all students in the DOE system chose to attend school remotely, and were thus entirely reliant on the internet for their education. Many students with disabilities and vulnerabilities that place them at higher risk of severe complications if they fall ill with COVID-19, or students who live with at-risk family members, chose fully-remote learning so as not expose themselves or their families to the coronavirus and

the severe health outcomes of COVID-19.  The pandemic has hit Black and Hispanic/Latinx communities especially hard—with greater prevalence and comparatively worse health outcomes. Those communities are in turn disproportionately represented in the City's shelter system.

70.     DOE has not announced any date on which they plan to return to a fully in-person program.  The City's blended learning program was also subject to an important caveat—if the percentage of positive COVID-19 tests in New York City ever exceeded 3% using a 7-day rolling average, then schools would need to close fully again and move back to a system of entirely remote education.  On November 18, 2020, Defendant Carranza announced that this threshold had been reached and that all New York City public schools would need to revert to offering only remote education starting on November 19, 2020.

71.     Plaintiff Coalition for the Homeless was not the only party to express concerns to City officials, including Defendants, regarding the lack of reliable internet access for children in shelters.  For instance, on August 14, 2020, the New York City Bar Association wrote to Mayor de Blasio raising concerns about the thousands of homeless New Yorkers who lacked internet access because they resided in the City's shelters.

72.     On September 16, 2020, Comptroller Scott Stringer sent a letter to Mayor de Blasio and Defendant Carranza expressing concern that unreliable internet and cellular service in shelters would prevent homeless students from being able to attend class and receive a sound basic education.  Comptroller Stringer asked the City to provide his office with an assessment of how many shelters lacked adequate cell and internet reception and to detail any steps being taken to correct this "urgent situation."  Comptroller Stringer also urged the City to designate an "Interagency Director of Students in Temporary Housing" who would have authority to troubleshoot large system-level problems across agencies.

73. Defendants did not, as requested in Comptroller Stringer's letter, provide the Comptroller with an assessment of how many shelters lacked adequate cell and internet reception; did not detail any steps being taken to correct this "urgent situation"; and did not designate the proposed "Interagency Director of Students in Temporary Housing." In fact, the City did not respond to the Comptroller at all.

## IV.   The 2020-2021 School Year Begins, and Students in Shelters Continue to Struggle with Inadequate Access to the Virtual Classroom

74. As the 2020-2021 school year began, the pandemic was still active throughout New York City and other parts of the country. On September 16, 2020, the school year began remotely for all students. Not until September 21 were any public-school students able to attend in-person classes. And not until October 1 did all students who opted into the blended program begin in-person instruction.

75. Predictably, children living in shelters, including Plaintiffs, experienced issues accessing their online classes and coursework from the very outset of the school year.

76. If anything, engaging in remote schooling this fall has been more difficult for Plaintiffs than it was in the spring. This increased difficulty has been in part due to DOE's pivot from emergency remote learning, which often required a check-in and remote assignments, to an expectation that students would be engaged in classes for hours by videoconference. This shift has placed an impossible strain on the already shaky internet or cellular services available to Plaintiffs, causing their children to fall further behind.

77. Once again, Plaintiff Coalition for the Homeless promptly brought these issues to the attention of DOE and DHS representatives. As before, DOE and DHS representatives did not dispute the necessity of reliable internet access for remote learning, but again failed to articulate any action plan to resolve the connectivity issues plaguing the shelters.

78.    On October 8, 2020, Milbank LLP and The Legal Aid Society, counsel for Plaintiffs, sent a letter to Defendants Carranza and Carter demanding that they and their respective agencies take action, at long last, to install WiFi at the Flatlands shelter and others experiencing similar problems with reliable internet access.

79.    On October 14, 2020, DOE's General Counsel, Howard Friedman, responded to the October 8 letter sent by Plaintiffs' counsel.  Friedman asserted that "all remote learning apps performed satisfactorily" at the Flatlands shelter when using Verizon's cellular network, rather than T-Mobile's, admitting nearly eight months after the school closures that T-Mobile's cellular network had ***not*** been performing satisfactorily at the Flatlands shelter.  Friedman further demurred regarding WiFi installation, noting dismissively that it was Plaintiffs' counsel's "preferred solution" but that DOE would need to evaluate "technical requirements and cost."

80.    On October 16, 2020, at a City Council hearing, Defendant Carranza confirmed that DOE remained focused on using cellular technology for students living in shelters, rather than equipping those shelters with WiFi, adverting vaguely to feasibility and cost issues.   On information and belief, at least as of October 20, Defendants DOE and/or DHS had not arranged for a technician to visit the Flatlands shelter and determine whether WiFi installation would in fact pose material feasibility or cost issues there.  And DOE and DHS representatives maintained that switching from T-Mobile to Verizon for cellular service would likely be sufficient to address the connectivity issues, even though they were aware that Verizon's service also suffered from dead zones.  At the same time that they maintained this view, at least one homeless student living in the Flatlands shelter was unable to access the internet on his iPad after the switch from T-Mobile to Verizon.  While this student has since moved to a different unit in the building where he is now

able to connect, reliance on cellular service is an unsustainable alternative to installing WiFi. Connectivity issues have persisted at the Flatlands shelter to the present day.

## V.    Mayor de Blasio Directs Shelter-Wide WiFi Installation

81.    On October 26, 2020, Mayor de Blasio held a daily press conference at which he was asked questions regarding the ability of children living in shelters to obtain reliable internet access and participate in remote schooling.  Rather than insisting that that cellular access on the DOE-distributed iPads was a sufficient solution, Mayor de Blasio acknowledged that it was necessary to equip shelters with WiFi.  Mayor de Blasio stated:

> [T]he instruction I have given to the Law Department and to Social Services is to ensure that every shelter gets WiFi, to send teams out to literally go shelter by shelter and simply ensure that, not just for that student but for the whole shelter, WiFi is in place. We've got to stop this and make sure everyone has what they need.

82.    At the same press conference, Defendant Carranza noted that he and Mayor de Blasio held themselves "accountable to make sure that we resolve any of those technology issues" that children in shelters were facing with respect to engaging in remote education.

83.    On October 28, 2020, the General Counsel of Defendant DSS, Martha Calhoun, sent a letter to Plaintiffs' counsel outlining the City's plan to effectuate the Mayor's directive.  Calhoun stated that DSS could not offer a "defined timeframe" for installing WiFi at the approximately 247 DHS sites that required it.  Instead, Calhoun offered an "aggressive goal" of completing the project by the summer of 2021—that is, after the 2020-2021 school year is over.  With respect to 27 "priority sites," including the Flatlands shelter, Calhoun indicated that installation could be complete at an undefined time "this winter," again with the caveat that this was the City's "aggressive goal" (meaning it would potentially not be achievable, in DSS's view).  Calhoun indicated that the City had begun surveying shelters to assess the feasibility of installing WiFi "last

week," even though Coalition for the Homeless had consistently raised the necessity of WiFi access for students living in shelters beginning as early as the spring of 2020.

84.    On October 29, 2020, in another press conference, Mayor de Blasio again acknowledged the importance of ensuring all students in shelters had access to reliable WiFi. Mayor de Blasio stated:  "[W]e have to be there for these kids.  We are going to rewire all of the shelters that have kids in them, period.  We'll have a timeline.  I'm going to let our law department and our social services department speak to that."

85.    On October 30, 2020, counsel for Plaintiffs sent a second letter to Mayor de Blasio and Defendants Carranza, Carter, Banks, and Tisch reiterating the demand that they and their respective agencies take immediate action to install WiFi at shelters across the city.  The letter explained that the City's indication that WiFi would not be fully installed in the City's shelters until the summer of 2021 at the earliest was unacceptable as it would cause many students to miss the entire 2020-2021 school year, and reminded Defendants of Mayor de Blasio's stated commitment to installing WiFi in every shelter in the City.

86.    On November 16, 2020, Georgia Pestana, an attorney in the City of New York Law Department, sent a letter to Plaintiffs' counsel to provide an update on the City's plans to provide internet access to students living in shelters.  While the letter indicated that installation of WiFi had finally begun at the Flatlands shelter (approximately six months after the issue was presented to DOE and DHS representatives), it otherwise lacked particulars, stating that "surveys" of "almost half of the shelter sites" had been completed, and that installation work would begin "at several additional shelters soon."  The letter did not indicate the shelters where such installation would begin; how many shelters were meant by the word "several"; or what timeline was contemplated by the word "soon."  Instead, Pestana attempted to shift much of the blame for Plaintiffs' and other

Class members' connectivity issues onto "individual device" errors, "human error," or other issues unrelated to the lack of WiFi service that the Mayor himself had specifically directed be provided.

87.     On November 17, 2020, when asked at a press conference about the City's failure to address homeless students' inability to access their remote education due to a lack of WiFi, Mayor de Blasio failed to reiterate his commitment to installing WiFi in every shelter in New York City, and instead applauded the City's measures taken to date as "enlightened."  Although Mayor de Blasio acknowledged that there was more to be done, his defensiveness on the topic, coupled with Pestana's blame-shifting and non-committal letter, were the latest example of the City's recalcitrance in taking the necessary measures to ensure that students living in shelters can access their remote education.

88.     On November 18, 2020, Defendant Carranza announced that, due to increases in the rate of positive COVID-19 cases, all New York City public schools would resume fully remote education starting the next day.  Defendant Carranza and Mayor de Blasio have called this shut down temporary, but have offered no information on when schools will be able to re-open for in-person learning again and have conceded that no plan for doing so has yet been prepared.  At the time of this filing, New York City's public schools remain closed and remote learning is the only means for children to receive an education.

89.     As a result of the City's failure to address the lack of adequate internet connectivity in shelters within any reasonable timeframe, Plaintiffs and other Class members are effectively locked out of the virtual classroom—a deprivation of their right to a sound basic education that threatens to continue for most if not all of the 2020-2021 school year.

**VI.**     **The Operative Constitutional and Statutory Scheme**

90.     Article XI, § 1 of the New York Constitution (the "Education Article") provides that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."  N.Y. Const. art. XI, § 1.

91.     As construed by the New York Court of Appeals, the Education Article requires the State to provide "a sound basic education" to all students within the state.  *Bd. of Educ. v. Nyquist*, 439 N.E.2d 359, 369 (N.Y. 1982).  This means that the State must afford "New York City schoolchildren the opportunity for a meaningful high school education, one which prepares them to function productively as civic participants."  *Campaign for Fiscal Equity, Inc. v. State*, 801 N.E.2d 326, 332 (N.Y. 2003).

92.     As a municipality of New York State, New York City is bound by the New York State Constitution and laws passed by the State Legislature.

93.     New York State Education Law § 3209 ("NYSEL") also requires Defendants to provide for the education of homeless children in New York State.

94.     NYSEL § 3209(6)(b) requires state officials to monitor local school districts to ensure that "such districts review and revise any local regulations, policies, or practices that may act as barriers to the enrollment or attendance of homeless children in school or their receipt of comparable services as defined in Part B of Title VII of the Federal Stewart B. McKinney Act."

95.     NYSEL § 3209(7) requires public welfare officials to "furnish indigent children with suitable clothing, shoes, books, food, transportation, and other necessaries to enable them to attend [school] upon instruction as required by the law."

96.     Federal law imposes additional, independence obligations on Defendants to ensure appropriate educational access for homeless children.  In 1987, recognizing the significant

obstacles that homeless individuals face, Congress passed the McKinney-Vento Act, Pub. L. No. 100-77, § 102(b)(2), 100 Stat. 482, 485 (codified as amended at 42 U.S.C. §§ 11431-11435). The McKinney-Vento Act provides various forms of assistance to homeless individuals and families. Subtitle VII-B of the McKinney-Vento Act relates to the education of homeless children and youth. 42 U.S.C. §§ 11431-11435.

97.   The McKinney-Vento Act considers children who "lack a fixed, regular, and adequate nighttime residence" to be homeless. *Id.* § 11434a(2)(A). Under the McKinney-Vento Act, Congress provides funds to states to help them educate homeless children. Such funds are made available to states only on the condition that "[e]ach State educational agency shall ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education . . . as provided to other children and youths." *Id.* § 11431(1). Grants given to the state under the McKinney-Vento Act must be used to achieve Congress' stated policy of ensuring homeless youth and children have equal access to an education and to "provide services and activities . . . to enable [homeless children and youths] to enroll in, attend, and succeed in school." *Id.* § 11432(d).

98.   The McKinney-Vento Act also requires State and local educational agencies to "review and undertake steps to revise" any "regulations, practices, or polices" that "may act as a barrier to the . . . attendance or success in school of . . . homeless children and youths." *Id.* § 11431(2). The McKinney-Vento Act mandates that homeless children and youths "should have access to the education and other services that [they] need to ensure that [they] have an opportunity to meet the same challenging State academic standards to which all students are held." *Id.* § 11431(4).

99.   The McKinney-Vento Act confers enforceable rights upon its beneficiaries who may sue to enforce those rights under 42 U.S.C. § 1983.  *See Nat'l Law Ctr. on Homelessness & Poverty v. New York*, 224 F.R.D. 314, 319 (E.D.N.Y. 2004); *Lampkin v. District of Columbia*, 27 F.3d 605, 612 (D.C. Cir. 1994).

100.   In 2019, Defendant DOE received $2.5 million of the $5.1 million in federal grant money that the New York State Education Department was awarded under the McKinney-Vento Act.

101.   By accepting those funds, Defendant DOE is required to comply with all provisions of the McKinney-Vento Act, including the provisions requiring DOE to ensure that each homeless child in New York City has equal access to "the same free, appropriate public education . . . as provided to other children and youths."  *Id.* § 11431(1).

102.   Finally, Defendants' obligations are governed by the Fourteenth Amendment to the U.S. Constitution.  The Fourteenth Amendment prohibits any state from denying "to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. IV, § 1 (the "Equal Protection Clause").  The Equal Protection Clause applies to state policies or practices that interfere with homeless children's access to public school education.  *See, e.g.*, *Nat'l Law Ctr. on Homelessness & Poverty*, 224 F.R.D. at 321-22.

## VII.   Defendants Have Failed to Meet their Constitutional and Statutory Duties

103.   Defendants, who collectively have responsibility for matters concerning the New York City public schools and the City's homelessness policies, have failed to meet their constitutional and statutory mandate to provide a sound basic education to children residing in shelters during the COVID-19 pandemic.

104.  Because the COVID-19 pandemic has made attendance in the virtual classroom a basic prerequisite to receiving an education, Defendants' failure to provide students with reliable internet access amounts to denial of these students' access to public school.

105.  Defendants have been aware since the outset of the pandemic and associated school closures that homeless students residing in shelters were unable to access the virtual classroom due to lack of reliable internet access.  Only now are Defendants expressing any concrete intention to ameliorate the situation by providing WiFi, and even then on a patently unacceptable timetable—one that requires Plaintiffs and other Class members to effectively forego the 2020-2021 school year.

106.  Defendants were on notice of internet access issues at the Flatlands shelter and other shelters well before the current school year began—one that City officials, including Defendants, knew was likely to be at least partly if not wholly remote—giving Defendants ample time to ensure that students did not miss out on any of their education.  Instead, Defendants avoided taking action until public scrutiny made further avoidance of the problem untenable.

107.  Even though Defendants have now acknowledged that the lack of adequate WiFi or equivalent alternative internet access in shelters, and the obstacle it poses to meaningful participation in school, is a serious issue, the plan that they have proposed to remedy this issue is wholly inadequate.  Even if Defendants achieve what they describe as an "aggressive goal," Plaintiffs and other students living at designated "priority sites" will effectively miss at least an entire semester of school, while others residing at non-priority sites will miss at least the entire 2020-2021 school year.

108.  Defendants do not appear to dispute that they are not in compliance with their legal obligations under New York and federal law.  In response to correspondence in which Plaintiffs'

counsel have explained to Defendants the precise manner in which their conduct violates the law, Defendants have never sought to defend the current state of affairs as compliant with their legal obligations, focusing exclusively on the efforts they purport to be undertaking to cure the violations.

## VIII.   Plaintiffs and Other Class Members Have Been Irreparably Injured by Defendants' Ongoing Violations of Their Constitutional and Statutory Duties

109.   As set forth above, as a result of Defendant's policies and practices concerning the provision of internet access in the City's shelters, Plaintiffs and other Class members have suffered and continue to suffer irreparable harm.

110.   Since New York City's public schools shifted to remote and blended learning models as a result of the COVID-19 pandemic, Plaintiffs and other Class members have consistently been denied a meaningful opportunity to attend class and complete their schoolwork due to a lack of adequate internet access in the shelters in which they live.

111.   Plaintiffs and other Class members have been forced to explore creative avenues to access the internet, often at financial cost to themselves, in order to avoid missing school and losing educational opportunities.  For example, parents have used their phones as internet "hotspots," risking or actually incurring high fees for data use overages.  Parents have sent their children to the homes of family members who have internet access, despite the risk of COVID-19 exposure. And, as noted above, parents have searched their neighborhoods for publicly accessible WiFi networks they can access for long enough to download homework, including the LinkNYC stations that are located on sidewalks throughout the City.  One parent even rented a small office so her child could have access to reliable internet for school.

112.   As a result of these barriers to their education, Plaintiffs and other Class members have suffered setbacks in school performance due to missing class time.

113.  At this point, Plaintiffs and other Class members have already functionally missed the better part of the first months of this school year.  The purported "solution" that Defendants have proposed would mean that Plaintiffs' and other Class members' injuries would continue at least for the entire first half of the 2020-2021 school year, and potentially for much more of it. Other students residing in shelters may miss the entire school year altogether.  As a result, Plaintiffs and other Class members will be forced either to repeat the same grade or enter school next year entirely unprepared.

114.  Plaintiffs' and other Class members' injuries result from and are directly traceable to Defendants' failure to comply with the Education Article of the New York Constitution, NYSEL § 3209, the McKinney-Vento Act, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

## CLASS ALLEGATIONS

115.  Plaintiffs bring this action individually and on behalf of all persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2).

116.  The proposed class is defined as follows:

> *All students enrolled in DOE schools or public charter schools who currently reside in, or at any time after March 26, 2020 resided in, shelters operated by the City of New York and/or any of its agencies, and who lack reliable internet access inside said shelters (the "Class").*

117.  The persons in this class are so numerous that joinder of all such persons is impracticable and disposition of their claims in a class action is a benefit to the parties and to the Court.  There are over 10,000 families with children residing in 247 DHS-run shelters across the City, 240 of which Defendant DHS has designated as requiring WiFi installation.  There are also many families with children residing in HRA-run domestic violence shelters.

28

118.   Plaintiffs' claims present common questions of law and fact.  All members of the Class have been subject to the same fully remote or blended learning program that requires reliable internet access.  Upon information and belief, all members of the Class lack reliable internet access in their shelters, the legality of which would be determined under the same provisions of the New York Constitution, NYSEL, the McKinney-Vento Act, the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1983, and the Declaratory Judgment Act.

119.   Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs have been and are being denied their legal right to a sound basic public education due to Defendants' failure to provide WiFi during a fully remote or blended education environment.  Without access to an adequate and continuous public education, all similarly situated children face serious setbacks in their developmental path to becoming productive, self-sufficient adults.

120.   Plaintiffs will fairly and adequately protect the interests of the Class.  There are no conflicts between the Plaintiffs and other Class members.  Plaintiffs have retained counsel experienced in class litigation, including litigation relating to education, homelessness policy, and civil rights.

121.   Defendants have acted and/or failed to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

122.   The indefinite delay in installing WiFi in shelters is particularly harmful to Plaintiffs and Class members while the pandemic persists—especially since students have had to transition back to fully remote learning as of November 19, 2020.  At the time of this filing, New York City's schools were closed with no plan in place for reopening, making fully remote learning the only

means for children to receive an education.  Therefore, any further delay in installing WiFi will further irreparably harm Plaintiffs and other members of the Class.

123.  Certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23(b)(2) is an appropriate method for the fair and efficient adjudication of this controversy.  Absent class certification, it is unlikely that Defendants' unlawful behavior could be remedied, particularly given the numerous obstacles to bringing and maintaining a lawsuit faced by homeless families. Indeed, absent class certification, the expansive WiFi connectivity crisis in at least 240 of the City's shelters will go unremedied or insufficiently remedied, and the systemic failure to educate children residing in shelters will continue unabated so long as the COVID-19 pandemic and its attendant restrictions continue.

## CAUSES OF ACTION

### Count One

### VIOLATION OF ARTICLE XI, § 1 OF THE NEW YORK CONSTITUTION

124.  Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

125.  The Education Article of the New York Constitution mandates that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated."  N.Y. Const. art. XI, § 1.

126.  The Education Article thus provides a constitutional guarantee of a "sound basic education" for all children living in the State of New York.  *See Nyquist*, 439 N.E.2d at 369.

127.  Defendants have failed to provide a sound basic education to Plaintiffs and other Class members because they have failed to provide the internet access necessary to enable Plaintiffs to access remote instruction from their schools during the COVID-19 pandemic.

128.  Plaintiffs and other Class members have been irreparably injured as a proximate result of Defendants' ongoing violation of the Education Article.

129.  Plaintiffs and other Class members are entitled to immediate injunctive relief and associated remedies, as set forth in the Prayer for Relief below.

## Count Two

## VIOLATIONS OF NEW YORK STATE EDUCATION LAW § 3209

130.  Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

131.  Plaintiffs and other Class members are "homeless children" as defined in NYSEL § 3209(1)(a)(1) because they lack a fixed, regular, and adequate nighttime residence.

132.  Plaintiffs and other Class members have been denied access to their education due to Defendants' policies and practices, which act as barriers to the school attendance of Plaintiffs and other Class members, in violation of NYSEL § 3209(6)(b).  Defendants' failure to provide adequate WiFi at shelters across New York City has prevented Plaintiffs and other Class members from attending the virtual classroom that has become essential to receiving an education during the COVID-19 pandemic.

133.  Defendants have failed to furnish Plaintiffs and other Class members with suitable "necessaries to enable them to attend" school "as required by the law" in violation of NYSEL § 3209(7).  Access to the virtual classroom has become necessary to facilitate school attendance. Defendants have failed to provide Plaintiffs and other Class members with the technology necessary to ensure this access.  Defendants were repeatedly made aware of their failure yet failed to implement any corrective measures to place themselves in compliance with the law.

134.  Plaintiffs and other Class members have been irreparably injured as a proximate result of Defendants' ongoing violation of the NYSEL § 3209.

135.  Plaintiffs and other Class members are entitled to immediate injunctive relief and associated remedies, as set forth in the Prayer for Relief below.

## Count Three

### VIOLATIONS OF THE MCKINNEY-VENTO ACT

136.  Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

137.  The McKinney-Vento Act seeks to provide homeless children with "equal access to the same free, appropriate public education . . . as provided to other children and youths."  42 U.S.C. § 11431(1).

138.  Defendants have failed to "provide services" that will enable homeless children and youths like Plaintiffs and other Class members to "attend" and "succeed" in school as required under the McKinney-Vento Act.  *Id.* § 11432(d).

139.  Defendants have also failed to "review and undertake steps to revise" any "regulations, practices, or policies" that "may act as a barrier to the… attendance or success in school of… homeless students and youths" like Plaintiffs and other Class members in violation of the McKinney-Vento Act.  *Id.* § 11431(2).

140.  Defendants were made aware on multiple occasions, beginning as early as the spring of 2020, that their refusal to provide adequate WiFi access in shelters across the city had acted and would continue to act as a barrier to the ability of homeless students to attend and succeed in school given the City's move to a blended learning program that included significant online instruction. Given the realities of the COVID-19 pandemic, there is no service more essential to the ability of

Plaintiffs and other Class members to attend and succeed in school than adequate WiFi.  It will be

impossible for Plaintiffs and other Class members to "meet the same challenging State academic

standards to which all students are held" without access to reliable WiFi.  *Id.* § 11431(4).  This is

especially true now that New York City's public schools have returned to a fully remote learning

model.  However, Defendants failed and continue to fail to take appropriate action to remove this

impediment and provide Plaintiffs and other Class members with a necessary service in violation

of their obligations under the McKinney-Vento Act.

141.  Plaintiffs and other Class members have been irreparably injured as a proximate

result of Defendants' ongoing violation of the McKinney-Vento Act.

142.  Plaintiffs and other Class members are entitled to immediate injunctive relief and

associated remedies, as set forth in the Prayer for Relief below.

### Count Four

**VIOLATIONS OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION**

143.  Plaintiffs hereby repeat and incorporate by reference each of the allegations in the

foregoing paragraphs set forth above.

144.  The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution

guarantees "the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

145.  Public education plays a key role in allowing an individual to participate in society

and promotes the social, economic, and intellectual well-being of that individual.  Preventing

homeless children from receiving a public education denies them access to an important means by

which they and their family can alleviate their plight.

146.  By systematically refusing and failing to provide homeless children with the same

access to a free public education that is enjoyed by students and families of children who are not

homeless, Defendants have violated Plaintiffs and other Class members' rights to equal protection under the law.

147.  Defendants' actions in denying Plaintiffs and other Class members the reliable internet access necessary to participate virtually in a public education were performed without any appropriate basis or justification sufficient to overcome Plaintiffs' and other Class members' substantial interests.

148.  Plaintiffs and other Class members have been irreparably injured as a proximate result of Defendants' ongoing violation of the Equal Protection Clause.

149.  Plaintiffs and other Class members are entitled to immediate injunctive relief and associated remedies, as set forth in the Prayer for Relief below.

## Count Five

### VIOLATIONS OF 42 U.S.C. § 1983

150.  Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

151.  By implementing, authorizing, tolerating, and permitting the policies and practices pursuant to which homeless children have been denied access to a free public education in New York City, Defendants have deprived, and will continue to deprive, Plaintiffs and other Class members of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States in violation of 42 U.S.C. § 1983 and of rights guaranteed by federal law, including the McKinney-Vento Act and the Equal Protection Clause.

152.  All Defendants have acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment.  Defendants' acts

described herein were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers.

153.   Plaintiffs and other Class members have been irreparably injured as a proximate result of Defendants' ongoing violation of 42 U.S.C. § 1983.

154.   Plaintiffs and other Class members are entitled to immediate injunctive relief and associated remedies, as set forth in the Prayer for Relief below.

**Count Six**

**REQUEST FOR DECLARATORY RELIEF PURSUANT TO 28 USC §§ 2201-2202**

155.   Plaintiffs hereby repeat and incorporate by reference each of the allegations in the foregoing paragraphs set forth above.

156.   As set forth above, there is an actual controversy between Plaintiffs and Defendants concerning Defendants' failure to comply with the New York Constitution, NYSEL § 3209, the McKinney-Vento Act, the Fourteenth Amendment of the U.S. Constitution, and 42 U.S.C. § 1983, with respect to the provision of a sound basic education and related services to Plaintiffs and other members of the Class.

157.   Defendants' failure to provide WiFi to school-age children residing in shelters deprives them of access to the sound basic education to which they are entitled.  The inexcusable delay in installing WiFi in shelters is particularly harmful to Plaintiffs and Class members while the pandemic persists—especially since students have again had to transition to fully remote learning because of the high COVID-19 positivity rate in New York City.

158. Accordingly, pursuant to 28 USC §§ 2201-2202, Plaintiffs are entitled to a declaratory judgment stating that Defendants have violated Article XI, § 1 of the New York

Constitution, NYSEL § 3209, the McKinney-Vento Act §§ 11431-11432, and the Equal Protection

Clause of the Fourteenth Amendment to the U.S. Constitution.

## REQUEST FOR A PRELIMINARY INJUNCTION

159.  Plaintiffs hereby repeat and incorporate by reference each of the allegations in the

foregoing paragraphs set forth above.

160.  Plaintiffs seek a preliminary injunction ordering Defendants to install WiFi as soon

as is reasonably practicable, but no later than January 4, 2021, at all shelters housing school-age

children in New York City to permit Plaintiffs and other Class members to access their education

in accordance with Defendants' obligations under state and federal law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray to this Court for an Order:

A.    Granting a preliminary injunction ordering Defendants to equip all shelters

housing school-age children in New York City with reliable WiFi access as soon

as is reasonably practicable, but in no event later than January 4, 2021;

B.    Directing Defendants to submit to the Court a comprehensive plan for how

they will install and maintain WiFi access in every shelter housing school-age

children in New York City to enable students living in shelters to attend school;

C.    Certifying this case as a class action under Federal Rules of Civil Procedure

23(a) and 23(b)(2).

D.    Declaring that Defendants' policies, customs, patterns, and practices

concerning the provision of internet access at Defendants' shelters throughout New

York City, as described herein, violate the New York State Constitution, NYSEL,

the McKinney-Vento Act, and the U.S. Constitution;

E.      Awarding Plaintiffs and other Class members compensatory damages;

F.      Awarding Plaintiffs their costs and reasonable attorneys' fees in this action;

and

G.      Awarding such other and further relief as this Court deems just and proper.

Dated:  November 23, 2020
        New York, New York

                                THE LEGAL AID SOCIETY

                                /s/ Susan J. Horwitz
                                _____

                                Susan J. Horwitz
                                Janet Sabel
                                Adriene Holder
                                Judith Goldiner
                                Joshua Goldfein
                                Beth Hofmeister
                                Kathryn Kliff
                                199 Water Street
                                New York, NY 10038
                                Telephone: (212) 577-3300
                                SHorwitz@legal-aid.org


                                MILBANK LLP

                                /s/ Grant R. Mainland
                                _____

                                Grant R. Mainland
                                Maria Esperanza Ortiz
                                55 Hudson Yards
                                New York, NY 10001
                                Telephone: (212) 530-5251
                                GMainland@milbank.com


                                *Attorneys for Plaintiff*

37