# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| E.G., individually and as parent and natural guardian of A.I. and L.I., minor children; M.M., individually and as parent and natural guardian of E.H., L.H., Ev.P., and E.P., minor children; O.M., individually and as parent and natural guardian of A.M., a minor child; and COALITION FOR THE HOMELESS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF NEW YORK; NEW YORK CITY DEPARTMENT OF EDUCATION; RICHARD A. CARRANZA, as Chancellor of the New York City Department of Education; NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES; STEVEN BANKS, as Commissioner of the New York City Department of Social Services; NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES; JOSLYN CARTER, as Administrator of the New York City Department of Homeless Services; NEW YORK CITY HUMAN RESOURCES ADMINISTRATION; GARY JENKINS as Administrator of the New York City Human Resources Administration; NEW YORK CITY DEPARTMENT OF INFORMATION TECHNOLOGY AND TELECOMMUNICATIONS; and JESSICA TISCH, as Commissioner of the New York City Department of Information Technology and Telecommunications,, <br><br> Defendants. | CIVIL ACTION NO. 1:20-cv-9879 (AJN) <br><br><br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

FACTS .............................................................................................................. 3

    I.   The COVID-19 Pandemic Upends Education in New York City For Much of 2020.......3

    II.  Defendants' Efforts to Secure Technology and Internet Access For Students Residing at
        Shelters and to Support Their Instructional Needs……………………….................…4

      A.  Defendants Obtain and Distribute Over 300,000 iPads Enabled With Unlimited Cellular
          Data Service in Spring 2020 .......................................................................... 4

      B.  Defendants' Efforts to Address and Improve Students' Internet Access ........................ 5

      C.  DOE Provides Instructional Alternatives for Students With Internet Connectivity Issue.7

    III.  Defendants' Aggressive Efforts to Install WiFi at Over 200 Shelters by Summer 2021...8

    IV.  The Named Plaintiffs……………………….....................................................12

ARGUMENT .................................................................................................... 13

    I.   Legal Standard……………………………………………………………...……13

    II.  Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims and Cannot Meet the
        Heightened Substantial Likelihood Standard …………………………………………15

      A.   Plaintiffs' Claim that Defendants Violate Article XI § 1 of the New York Constitution
          Fails to State a Claim .................................................................................. 15

      B.   Plaintiffs' Claims Under the McKinney-Vento Act and New York State Education
          Law § 3209 Also Fail to State a Claim ......................................................... 16

      C.   Plaintiffs' Equal Protection Clause Fails As a Matter of Law ..................................... 19

III. PLAINTIFFS HAVE FAILED TO ESTABLISH IRREPARABLE HARM………………..22

IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST
PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF…………………….24

CONCLUSION................................................................................................... 25

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Aristy-Farer v. State of New York*, 29 N.Y.3d 501 (NY 2017)..................................................... 16

*Armour v. City of Indianapolis*, 566 U.S. 673 (2012)................................................................... 19

*Campaign for Fiscal Equity, Inc. v. State of New York*, 100 N.Y.2d 893 (NY 2003).................. 15

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30 (2d
    Cir. 2010) ...................................................................................................................... 14

*Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist.*, 689 F. Supp. 197 (S.D.N.Y. 1998)......... 23

*D.C. v. Wallingforn-Swarthmore Sch. Dist.*, 2018 U.S. Dist. LEXIS 140259 (E.D.Pa. 2018) .... 17

*D.D. v. N.Y. City Bd. of Educ.*, 465 F.3d 503 (2d Cir. 2006)................................................... 13,14

*Diversified Mortg. Inv'rs v. U.S. Life Ins. Co. of New York*, 544 F.2d 571 (2d Cir. 1976) .......... 22

*Doe v. N.Y. Univ.*, 666 F.2d 761 (2d Cir. 1981). ......................................................................... 22

*Faiveley Transport. Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009)........................... 22

*Franza v. Carey*, 518 F. Supp. 324 (S.D.N.Y. 1981) ................................................................... 20

*Fullwood v. Vosper*, No. 9:99CV1586, 2007 U.S. Dist. LEXIS 1840 (N.D.N.Y. Jan. 9, 2007).. 20

*G.S. v. Rose Tree Media Sch. Dist.*, 914 F.3d 206 (3d Cir. 2018) ................................................ 17

*In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455 (S.D.N.Y. 2005) .................................... 14

*Joel v. City of Orlando*, 232 F.3d 1353 (11th Cir. 2000)............................................................. 21

*Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir. 1996)*..................................................................... *13*

*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75 (2d Cir. 1990). .......................................... 13

*Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450 (1988)............................................................ 1,9 20

*, 21Kreimer v. Bureau of Police*, 958 F.2d 1242, 1269  (3d Cir. 1992) ....................................... 21

*Li v. Certain Underwriters at Lloyd's*, 183 F. Supp. 3d 348 (E.D.N.Y. 2016) ........................... 14

*Manbeck v. Katonah-Lewisboro Sch. Dist.*, 435 F. Supp. 2d 273 (S.D.N.Y. 2006).................... 19

*Mastrovincenzo v. City of New York*, 435 F.3d 78 (2d Cir. 2006)............................................... 14

*McCarthy v. Cuomo*, No. 20-cv-2124 (ARR), 2020 U.S. Dist. LEXIS 107195
    (E.D.N.Y. June 18, 2020) ............................................................................................. 21

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018) .... 13

*N.J. v. New York*, 872 F. Supp. 2d 204 (E.D.N.Y. 2011) ....................................................... 17, 23

*N.Y. Civ. Liberties Union v. State*, 4 N.Y.3d 175 (NY 2005)................................................. 15, 16

*Nat'l Law Ctr. on Homelessness & Poverty v. New York*, 224 F.R.D. 314

(E.D.N.Y. 2004) ................................................................................................ 17, 19

*New York v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015); ............................................... 22

*Paynter v. State*, 100 N.Y.2d 434 (NY 2003) ............................................................. 16

*Plyler v. Doe*, 457 U.S. 202 (1982) ........................................................................... 19

*San Antonio Independent School District v. Rodriguez,* 411 U.S. 1 (1973 .................... 19

*Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142 (D.D.C. 2011) ..................... 23

*Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 468 F. App'x 43

(2d Cir. 2012) ..................................................................................................... 22

*TRT Leaseco, LLC v. DGI-BNSF Corp.*, No. 20-cv-5257, 2020 U.S. Dist. LEXIS 168768

(S.D.N.Y. Sept. 15, 2020) ................................................................................... 23

*Turner v. E. Meadow Sch. Dist.*, No. 07-CV-4318 (JS)(AKT), 2009 U.S. Dist. LEXIS 29524

(E.D.N.Y. Mar. 31, 2009) ................................................................................... 19

*V.W. v. Conway*, 236 F. Supp. 3d 554 (N.D.N.Y. 2017) ............................................. 23

*Wallace v. New York*, 40 F. Supp. 3d 278 (E.D.N.Y. 2014) ........................................ 21

## Statutes

42 U.S.C. § 11342-33 ................................................................................................ 17
42 U.S.C. § 11431 ........................................................................................... *passim*
New York Education Law § 3209 ..................................................................... *passim*

## Constitutional Provisions

N.Y. Const. art XI, § 1 .............................................................................................. 15
U.S. Const., amend. XIV ........................................................................................... 19

## PRELIMINARY STATEMENT

Through this class action complaint, and the motion for a preliminary injunction, Plaintiffs, who are three parents of school-aged children who currently reside in New York City shelters and claim they are entitled to internet service provided through a WiFi connection in order for their children to participate in remote learning, seek to compel Defendants to perform the impossible: complete a massive construction project to equip over 200 shelter buildings, many of which have no existing infrastructure, with WiFi, in approximately one month, in the middle of a pandemic.  Plaintiffs' motion should fail for this reason alone.

Plaintiffs' motion should also be denied because Plaintiffs cannot demonstrate a likelihood of success on the merits, let alone the clear or substantial likelihood of success that is required where a plaintiff seeks a mandatory injunction against the government and seeks an injunction that would provide the plaintiff with all the relief that is sought in the action.[1] Plaintiffs have not demonstrated a right to WiFi, and each of Plaintiffs' claims fail as a matter of law: (1) a claim pursuant to the Education Article of the New York State Constitution runs against the State, and requires Plaintiffs to allege insufficient State resources and district-wide deficiencies, which Plaintiffs plainly have not done; (2) any private cause of action pursuant to the McKinney-Vento Act and the New York Education Law § 3209 is limited to specific statutory rights to select among the mandated choices for enrollment or the specific services guaranteed by the statutes; there is no plausible interpretation of these statutes that requires Defendants to undertake the installation of WiFi at the shelters where Plaintiffs reside, especially during a pandemic; and (3) Plaintiffs have identified no violations of a fundamental right or

---

[1]  Plaintiffs seek a preliminary injunction ordering Defendants to equip all shelters housing school-aged children with reliable WiFi access as soon as is reasonably practicable, but in no event later than January 4, 2021, which is same as the ultimate relief sought in the complaint.

suspect classification, and cannot demonstrate that Defendants' reasonable and good faith efforts to provide remote learning to students in shelter during a pandemic constitutes an Equal Protection violation.

Moreover, Plaintiffs cannot establish irreparable injury that was caused by Defendants.   The transition from in-person instruction to remote learning was caused by the COVID-19 pandemic, not by Defendants.  Indeed, by Plaintiffs' own admission, Defendants sought to equip Plaintiffs with internet access so that they can participate in remote learning by providing them, and all students residing in shelter, with an iPad enabled with unlimited cellular data in the spring of 2020. In response to reports that students at some shelters were having trouble connecting to the internet with those iPads, which were provided with T-Mobile service, the New York City Department of Education ("DOE") has switched out the T-Mobile service for Verizon service for over a thousand students.  DOE and the New York City Department of Social Services ("DSS") also collaborated to proactively identify the families that were having issues with a DOE-issued iPad through a survey of all families with school-age children residing in a shelter.  DOE has also engaged 50 technicians and deployed them over the last five weeks to provide on-site technical assistance at over 90 shelter sites to meet with families individually and assist them in the resolution of connectivity issues.

And, finally, as Plaintiffs are well aware, Defendants are already in the process of doing exactly what Plaintiffs seek.  Defendants have embarked on a plan to install WiFi in each apartment at over 200 shelter buildings on an extremely accelerated timeline for a project that would ordinarily take two years.  Three shelters have already been completed and additional shelters will be completed this month and in the coming months, with the targeted completion of 30 top priority sites by March 2020 and all sites by the summer of 2021.

Because Plaintiffs cannot meet their heavy burden to justify a mandatory injunction against Defendants with feasible relief, Plaintiffs' motion should be denied.

## FACTS

### I.     The COVID-19 Pandemic Upends Education in New York City For Much of 2020

On March 15, 2020, Mayor de Blasio and Chancellor Carranza announced that as a result of the COVID-19 pandemic, New York City's vast system of over 1,800 public schools would close to in-person instruction for the safety and health of students, staff and their communities.  DOE undertook the enormous and unprecedented challenge of shifting to educating 1.1 million students remotely, many of whom had limited internet access. Declaration of Michael McGrath ("McGrath Decl.") ¶ 1; Declaration of Anuraag Sharma ("Sharma Decl.") ¶ 6.   In September, schools re-opened with a completely new model of education where students had the option of choosing the blended model of learning (hybrid in-person and remote learning) or fully remote learning.  Declaration of Lauren Siciliano ("Siciliano Decl") ¶ 7.  All students began with remote instructional orientation on September 16 and in-person learning was phased in by grade-level between September 21 and October 1. Siciliano Decl. ¶ 7.

Two months later, on November 19, 2020, the Mayor announced that schools would temporarily close to in-person instruction in accordance with the NYCDOE's State-approved reopening plan when the COVID-19 positivity rate rose above 3% in New York City using a seven-day rolling average. Siciliano Decl. ¶ 8.  Just a few weeks later, on November 29, the Mayor announced that, outside of State-designated Orange Zones, students in pre-K and 3K, as well as elementary schools would be permitted to return to school starting December 7. Siciliano Decl. ¶ 8.  In addition, outside of State-designated Orange Zones, blended learning

students in all grades in District 75 would be permitted to return to school starting December 10. Siciliano Decl. ¶ 8.  Middle schools and high schools are still closed to in-person instruction, with those students learning remotely.  Siciliano Decl. ¶ 8.

II.     **Defendants' Efforts to Secure Technology and Internet Access For Students Residing at Shelters and to Support Their Instructional Needs**

A.     **Defendants Obtain and Distribute Over 300,000 iPads Enabled With Unlimited Cellular Data Service in Spring 2020**

After the Mayor announced the shutdown of school buildings in March, the City acted quickly to secure the commitment of senior executives at Apple to provide the City with 300,000 iPads to distribute to students and to secure the commitment by T-Mobile to provide unlimited cellular service for the iPads at affordable rates.[2]  McGrath Decl. ¶ 3. Distributing these iPads that students could immediately utilize upon receipt at their homes during the height of the pandemic in New York City was an enormous operational and logistical challenge and required the mobilization of significant resources.  McGrath Decl. ¶ 4; Sharma Decl. ¶ 7.  The City worked with IBM to set up four warehouses that were used as locations for contractors to unpack the iPads provided by Apple, provision them with T-Mobile SIM cards, download apps and other programs for students to utilize, and repackage them with cases for shipment to students. McGrath Decl. ¶ 4.  Multiple City agencies coordinated to ensure the delivery of 300,000 iPads directly to students at their homes.   McGrath Decl. ¶  4; Sharma Decl. ¶ 7; Declaration of Erica Dean ("Dean Decl.") ¶ 4.  The City prioritized the distribution of iPads to families who were residing in shelters and had school age children, which was completed in

---

[2] Defendants subsequently obtained another 50,000 iPads that were also distributed.   Sharma Decl. ¶ 7. Defendants are currently in the process of obtaining, provisioning and delivering another 100,000 iPads to meet the ongoing needs of students, with a priority for students residing in shelters.  McGrath Decl. ¶ 4; Sharma Decl. ¶ 7.

March and April 2020. McGrath Decl. ¶ 4; Sharma Decl. ¶ 7; Dean Decl. ¶ 4; Declaration of Nicole Doniger Strom ("Strom Decl.") ¶ 4.

**B. Defendants' Efforts to Address and Improve Students' Internet Access**

After the iPads were delivered, DOE responded to questions from families that mainly pertained to learning the new technology, such as questions about how to log into the system. Sharma Decl. ¶ 8.  After school reopened in September 2020, DOE and DSS began hearing reports that a number of students at certain shelters reported having trouble connecting to the internet.  Sharma Decl. ¶ 8; Dean Decl. ¶ 5.  DOE sent technical teams to three shelters - Flatlands, Regent, and Children's Rescue - where a number of students were having trouble connecting to the internet. Sharma Decl. ¶ 9.  The technical teams were accompanied by engineers from Verizon, to test the strength of the signal for both T-Mobile service and Verizon service at the three buildings.  Sharma Decl. ¶ 9.  DOE's teams confirmed that all of the remote learning apps performed satisfactorily and better using Verizon service.  Sharma Decl. ¶ 9.  After DOE sent technical teams to six additional shelters to test the signal for both T-Mobile service and Verizon service, DOE made the decision to replace T-Mobile service with Verizon service on the iPads of all students living in these buildings and for all students that were having connectivity issues at other shelter buildings.  Sharma Decl. ¶ 10.  In October, the DOE swapped the SIM cards for 371 students at 8 shelters.  Sharma Decl. ¶ 11.

The DOE also established a central IT phone help desk ("Help Desk") initially dedicated to addressing technology-related issues only for families in shelters. This Help Desk began operating on Monday October 19, 2020.  Sharma Decl. ¶ 12. The Help Desk was originally available from 6:00 a.m. to 5:00 p.m., but DOE extended the hours to 9:00 p.m. starting November 9, 2020.  Sharma Decl. ¶ 12. Any student or family residing in a shelter who

reported a connectivity problem to the Help Desk was responded to within 24 hours and then, where required, the student's iPad was switched from T-Mobile to Verizon service. Sharma Decl. ¶ 12.  DSS worked with DOE to notify families residing at all shelters about the Help Desk and the hours families could call for assistance, including by distributing flyers, translated into several languages, under residents' doors and posting notices at the shelters regarding the availability of the dedicated Help Desk.  Dean Decl. ¶ 8; Strom Decl. ¶ 6.

DOE did not receive as many calls to the Help Desk as expected; although the NYCDOE worked with DSS to publicize the Help Desk contact information to shelter residents, ultimately only 10-12 calls per day from shelters were received. Sharma Decl. ¶ 12. As a result, near the end of October, in order to increase outreach to the families, DSS developed a survey to be conducted by shelter staff, either in person or on the phone, with families with school-aged children who were utilizing an iPad they received from DOE.  Dean Decl. ¶ 9; Sharma Decl. ¶ 13.  The survey sought to proactively identify families that were having any issue with the DOE-issued iPad, including, but not limited to, connecting to the internet.  Dean Decl. ¶ 9; Sharma Decl. ¶ 13-14.  Beginning at the end of October, the shelter staff contacted all families with school-aged children and identified approximately 2,900 families that reported some form of a problem with their DOE-issued iPad. Dean Decl. ¶ 10; Strom Decl ¶ 7. DSS provided DOE with information collected through the survey from approximately 2,300 families that consented to being contacted by DOE.  Dean Decl. ¶ 1; Strom Decl ¶ 8; Sharma Decl. ¶ 16.

In November, DOE engaged 50 temporary technicians and sent them to shelters to provide on-site technical assistance to families.  Sharma Decl. ¶ 13. These technicians are being deployed to shelters to connect with the families that reported issues through the DSS survey, but also to be available to address issues for any family at the shelter.  Sharma Decl. ¶ 13-14; Dean

Decl. ¶ 12.   The technicians troubleshoot the problems identified in the survey, which may include switching the T-Mobile service to Verizon service for a DOE-issued iPad.  Sharma Decl. ¶ 14. Staff at the shelters assist the technicians in contacting the families that have reported an issue, coordinating with families that can not be available while the technician is on-site, and contacting other families to determine if they are having a problem that the technician can address while on-site.  Dean Decl. ¶ 12. To date, these teams have conducted this outreach and support at over 90 shelter sites, prioritizing the shelter sites with more reported issues on the surveys.  Sharma Decl. ¶ 15. The teams are scheduled to complete all site visits within three weeks.  Sharma Decl. ¶ 15.

To date, these teams have been able to resolve over 80% of the technology issues reported by families in the survey conducted by DSS and communicated to DOE. Sharma Decl. ¶ 15.  Approximately, half of these families were found to have connectivity issues, and they received a swap from T-Mobile service to Verizon service.  Sharma Decl. ¶ 16.

In total, through all of its efforts to date, DOE has swapped 1,086 iPads from T-Mobile service to Verizon service. Sharma Decl. ¶ 15. The DOE continues to conduct call backs to students who have received a Verizon enabled iPad for feedback on internet connectivity after the swap.  Sharma Decl. ¶ 17.

### C. DOE Provides Instructional Alternatives for Students With Internet Connectivity Issues

To further address shelter connectivity issues, the City and the NYCDOE will begin offering access to Learning Bridges locations that have WiFi available for students to utilize for remote learning during the school day.   Siciliano Decl. ¶ 13.  Students can access this option even if they are enrolled in fully remote learning.  Siciliano Decl. ¶ 13.  Learning Bridges is a program developed by the City to provide childcare for students from 3-K to 8th grade for

days when they are scheduled for remote learning. Siciliano Decl. ¶ 13.  The Learning Bridges program is operated by community-based organizations at various locations throughout New York City.  Siciliano Decl. ¶ 13.  The option to attend Learning Bridges will be available to preschool to 8th grade students, including those that chose to be fully remote, residing at shelters DSS identified as high priority shelters based on the number of reported connectivity problems. Siciliano Decl. ¶ 13.  While transportation is not provided, most students can be placed at a location that is walking distance (less than 1 mile) from where they reside. Siciliano Decl. ¶ 13.

For high school students, and elementary and middle school students continuing to experience difficulty connecting to the internet with their DOE-issued iPad even after the switch to Verizon that do not want to participate in or are not eligible for Learning Bridges, the DOE's Directors of Student Services in the Borough/Citywide Offices will follow up with the student and ensure that the school has an individualized plan for each student.  Siciliano Decl. ¶ 14.  The NYCDOE had sent guidance to its schools to distribute paper packets and other instructional materials and resources for families without digital access; the individualized plan, among other things, will ensure the student is receiving those paper copies of materials and other instructional supports and resources, and will utilize resources available at the shelter location and different modalities for communication. Siciliano Decl. ¶¶ 12, 15.

### III. Defendants' Aggressive Efforts to Install WiFi at Over 200 Shelters by Summer 2021

Beginning in the middle of October, Defendants, through the Department of Information Technology and Telecommunications ("DoITT") and otherwise, began to explore options for the installation of WiFi at New York City shelters to provide additional options for students.  DSS operates shelters at 34 commercial hotels that were able to provide WiFi access to residents. Dean Decl. ¶ 15.  The installation of WiFi at the other shelter buildings overseen by

DSS is an enormous undertaking.  McGrath Decl. ¶ 7.  In order to provide students with robust WiFi connections sufficient for remote learning, each apartment within the shelter must be wired and provided an in-unit cable modem. McGrath Decl. ¶ 7.  DoITT considered less robust alternatives such as only wiring common areas within the shelters, but those options would have required students to congregate in common areas in order to access the internet during a pandemic and would have introduced technical challenges and limitations regarding the number of students that could simultaneously connect using the installed access points, and the shared consumption of bandwidth.  McGrath Decl. ¶ 7.

Many of the shelter buildings will require significant construction in order to provide WiFi connection and modems within each apartment.  McGrath Decl. ¶ 8. Some buildings are not connected to the external carrier's cable infrastructure in the street and many do not have the in-building infrastructure required to run the WiFi cable throughout the building (e.g., risers, conduit, etc.). McGrath Decl. ¶ 8.  For these buildings, the cable in the street must be wired into the building, then through newly constructed risers inside the building (e.g. elevator shafts or stairwells) in order to reach each floor, then through newly constructed conduit in hallways and then into individual apartments.  McGrath Decl. ¶ 8. As a result, the installation of WiFi in many of the shelters will require construction projects customized for each building and unit.  McGrath Decl.  ¶ 8.

On October 27, 2020, the Mayor directed DoITT to roll out the installation of WiFi at all New York City shelters.  McGrath Decl.  ¶ 10.  A few weeks earlier, DoITT had reached out to Charter Communications ("Charter") and Altice USA ("Altice"), which hold cable franchises to provide residential cable (and therefore, internet) services in New York City, in order to discuss the potential installation of WiFi connectivity at New York City shelters.

McGrath Decl. ¶ 9.   These companies were selected based on the size of their existing footprints (i.e., their wire was already in or nearby all of the buildings), and their ability to marshal crews to perform the necessary construction work (e.g., installation of risers and conduit).   McGrath Decl. ¶ 9. By November 1, Altice executed documentation with DoITT to install WiFi at shelters located within the geographic coverage of its franchise, as well as to provide all modems and routers, ongoing service and quality guarantees for upload and download speeds. McGrath Decl. ¶ 10.   Charter executed similar documentation on November 6.  McGrath Decl. ¶ 10.   Charter will install WiFi at 58 shelter buildings and Altice will install WiFi at 144 shelters buildings, all of which were identified by DSS.[3]   McGrath Decl. ¶ 11; Dean Decl. ¶ 14; Strom Decl. ¶ 10. DoITT also provided both Charter and Altice a combined list of 30 priority sites, which were identified by DSS based on information they collected about the conditions and experiences of students at those sites.  McGrath Decl. ¶ 15; Dean Decl. ¶14.

Before work can commence at any site, Charter and Altice must take a number of steps.  First, they must complete a site survey, which a requires a walk through of the building to determine what, if any, infrastructure exists and its condition and the entrance point for cabling from the street into the building; testing of the signal strength at the location is conducted in order to ensure that the installation will not saturate the network once the building is connected. McGrath Decl. ¶ 15.  Then, the site surveys are reviewed by several teams to confirm the design

---

[3] DSS operates 57 shelters in which residents already have WiFi access.  However, in most cases, the wiring extends through the hallways of the building, but not into the apartments. These shelters will be upgraded to in-unit WiFi.  Dean Decl. ¶ 16; Strom Decl. ¶10.  Shelters that are slated to be closed over the next few months or that do not house school-age children will not have WiFi installed.  Dean Decl. ¶¶ 17-18.  In addition, to the extent DSS utilizes scattered apartments located in private apartment buildings, known as Cluster Sites or Dwelling Units, to provide housing to families, those apartments will not be wired for WiFi.  Dean Decl. ¶¶ 17-18; Strom Decl. ¶ 11.

plans and to create costing.  Charter and Altice also have to secure all the necessary materials, confirm these plans with their subcontractors that will complete the work and schedule crews at the various locations, coordinate with DSS in order to ensure they will have access to the site, and secure the necessary permits and ensure that certificates of insurance are in place for each location.  McGrath Decl. ¶ 12.  They then submit a work order to DoITT.  Once DoITT approves the work order, the parties execute a Special/Custom Construction Order Agreement ("SCCOA") detailing the construction work and costs for the site and a Service Order Form ("SOF"), to cover the ongoing monthly charges for each apartment.  McGrath Decl. ¶ 13.

Despite the amount of work required to roll out this project, in the approximately one month since DoITT got approval to proceed, the parties have made extraordinary progress. WiFi has been installed at three sites to date. McGrath Decl. ¶¶ 15, 18. Charter has completed site surveys at 39 of its 58 sites and Altice has completed site surveys at 118 of its 144 sites. McGrath Decl. ¶ 14. Charter has been working at all of its 11 priority sites, along with 10 secondary priority sites. McGrath Decl. ¶15.  Altice has been working at 8 of its 19 priority sites. McGrath Decl. ¶ 15.  Ordinarily, these efforts - 157 site surveys and the commencement of work at 29 sites and completion of 3 projects - would take half a year to complete, but DoITT has made this project one of its highest priorities and made the urgency of this project very clear to Charter and Altice.  McGrath Decl. ¶ 16.

Construction will be completed, and WiFi installed, at additional sites this month, with many more completed in January and February.  McGrath Decl. ¶ 17. DoITT is working very aggressively to manage the work being done by Charter and Altice in order to ensure that WiFi will be installed at all 30 priority sites before March 2021.  McGrath Decl. ¶ 17.  In parallel to working on the 30 priority sites, Charter and Altice can also assign crews to the remaining

sites, some of which will be completed in the same timeframe, but due to the number of sites will stretch into the spring and summer of 2021.  McGrath Decl. ¶ 19.  A project of this nature would ordinarily be expected to take two years, if not more.  However, given the importance of this issue, DoITT has prioritized this project within the agency and is actively and aggressively managing Charter and Altice to meet the targeted completion date of the end of Summer 2021. McGrath Decl. ¶ 20.

### IV.    The Named Plaintiffs

Plaintiff O.M. resides at a shelter in Brooklyn.  Declaration of O.M. dated Nov. 23, 2020 ("O.M. Decl.") ¶¶ 1, 4. He has a 15-year-old son, who is a freshman at a DOE high school.  *Id.* ¶ 3.  Plaintiff O.M. received a T-Mobile enabled iPad for his son in the Spring and a Verizon enabled iPad a few weeks ago. *Id.* ¶¶ 5, 8.  Plaintiff is able to access the internet using the Verizon enabled iPad, though he loses internet once a day and sometimes more often.  *Id.* ¶ 8. This shelter is on DoITT's priority list and Altice is currently working at the shelter to install WiFi. Dean Decl. ¶ 19.

Plaintiff M.M. resides at a confidentially located domestic violence shelter, with her four children, all of whom attend a DOE elementary school.  Declaration of M.M. dated Nov. 23, 2020 ("M.M. Decl.") ¶  1, 3. Plaintiff M.M. received four iPads for her children in the Spring.  *Id.* ¶¶ 9-10.  Plaintiff M.M. has been able to access the internet intermittently after receiving assistance from the technology teacher, but her children get dropped from Zoom calls and sometimes are not able to connect to the internet at all.

While Plaintiff M.M. states that his or her shelter does not have WiFi access, *id.* ¶ 5, Defendants' records reflect that Plaintiff M.M. resides at a shelter which has internet pods/extenders in the ceilings on every floor that extends the WiFi to every room.  Strom Decl. ¶

12.  Plaintiff M.M.'s shelter will be upgraded to wire each of the apartments at the shelter. Strom Decl. ¶ 10. In addition, on November 2, 2020, the plaintiff M.M. filled out a survey at the shelter that indicated he or she had four devices for his or her children and did not have any issues with them. Strom Decl. ¶ 12.

Plaintiff E.G. resides at a shelter in Harlem with her four children, one of whom attends a DOE elementary school and one of whom attends a DOE middle school.  Declaration of E.G. dated Nov. 23, 2020 ("E.G. Decl.") ¶¶ 1, 3.  In March, Plaintiff E.G. received two T-Mobile enabled iPads for her children.  *Id.* ¶ 4. On December 1, E.G. received two Verizon enabled iPads for her children.  Dean Decl. ¶ 19.  Plaintiff E.G.'s shelter will be upgraded to wire each of the apartments at the shelter.  Dean Decl. ¶16.

## ARGUMENT

### I.      Legal Standard

A preliminary injunction "is an extraordinary remedy that should not be granted as a routine matter."  *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990).  "In general, to secure a preliminary injunction, the moving party must demonstrate: (1) irreparable harm, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *D.D. v. N.Y. City Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006) (internal quotations and citations omitted).  However, a plaintiff that seeks a "mandatory injunction that alters the status quo by commanding a positive act must meet a higher standard," and must "'make a clear or substantial showing of a likelihood of success' on the merits."  *Id.* (quoting  *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996)); *see also N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018).   This heightened

standard is "especially appropriate when a preliminary injunction is sought against government." D.D., 465 F.3d at 510 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006)).   Plaintiffs indisputably seek to alter the status quo by seeking an order requiring defendants to install WiFi in all shelters housing school-aged children by January 4, 2021.[4]   In addition, the "heightened substantial likelihood standard" also applies, where, as here, "the requested injunction (1) would provide the plaintiff with all the relief that is sought and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (quoting *Mastrovincenzo*, 435 F.3d at 90)).

Plaintiffs fail to meet their burden on each prong; they fail to establish a likelihood of success, let alone a substantial likelihood of success, for any of their claims to a right to WiFi; they fail to establish they will suffer irreparable injury that is caused by Defendants or that the relief sought is feasible; and they cannot show that the balance of hardships tips in favor of the Plaintiffs.   Indeed, Plaintiffs have utterly failed to show that Defendants' transition to remote learning is anything other than a reasonable and good-faith

---

[4] Plaintiffs' suggestion that the heightened standard does not apply here because the requested injunction requires defendants "to do only what [they] should have done earlier," (Pls. Mem. at 7, quotations and citations omitted), is specious in light of the scope of the act they seek to compel. The cases plaintiffs cite are completely inapposite.  In both *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 463 (S.D.N.Y. 2005) and *Li v. Certain Underwriters at Lloyd's*, 183 F. Supp. 3d 348, 361 (E.D.N.Y. 2016), plaintiffs sought to compel insurance companies to advance their defense costs as required by insurance policies covering the plaintiffs. In each case the court relied on the plain language of the insurance policies that required the outcome and gave the insurance companies the right to recoup the defense costs if they were successful on the merits. *Id.* at 360.

approach that continues to address and remedy problems that arise in connection with such a

massive transition in the face of an unprecedented pandemic.

## II.   Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims and Cannot Meet the Heightened Substantial Likelihood Standard

Plaintiffs essentially assert Defendants violated their right to WiFi, which

allegedly constitutes a "legal violation" of the following constitutional and statutory provisions:

(1) Article XI § 1 of the New York Constitution; (2) New York State Education Law § 3209; (3)

the McKinney-Vento Act, 42 U.S.C. 11431 et seq; and (4) the Fourteenth Amendment to the

U.S. Constitution.  Pls Mem at 11-13.   Plaintiffs cannot establish a likelihood of success, let

alone a substantial likelihood of success, on any of these claims. Indeed, all of these claims fail

as a matter of law.

### A.  Plaintiffs' Claim that Defendants Violate Article XI § 1 of the New York Constitution Fails to State a Claim

Plaintiffs' claim under the Education Article of the New York State Constitution fails for

several reasons.  *First*, the Education Article requires that "[t]he legislature shall provide for the

maintenance and support of a system of free common schools, wherein all the children of this

state may be educated."  N.Y. Const. art XI, § 1.  Thus, an Education Article cause of action runs

against the State, not the City, as the local school district; Defendants have found no cases

upholding such a claim against a local school district, and Plaintiffs have not cited to any.  *See*,

e.g., *Campaign for Fiscal Equity, Inc. v. State of New York*, 100 N.Y.2d 893, 908 (NY 2003)

("*CFE II*") (the issue is "whether *the State* affords New York City schoolchildren the

opportunity for a meaningful high school education.") (emphasis added); *N.Y. Civ. Liberties

Union v. State*, 4 N.Y.3d 175, 178-79 (NY 2005) ("Fundamentally, an Education Article claim

requires two elements: the deprivation of a sound basic education, and causes attributable to the

State.").  *Second*, Defendants have found no cases, and Plaintiffs fail to city any case, upholding a claim under the Education Article that did not involve allegations of insufficient State resources, which is not alleged here. *See, e.g., Paynter v. State*, 100 N.Y.2d 434, 441 (NY 2003) ("allegations of academic failures alone, without allegations that the State somehow fails in its obligation to provide minimally acceptable educational services, are insufficient to state a cause of action under the Education Article"; *Aristy-Farer v. State of New York*, 29 N.Y.3d 501, 510 (NY 2017) (requiring plaintiffs to plead "failures caused by inadequate state funding.").

 *Third*, an Education Article claim requires Plaintiffs to plead district-wide deficiencies, rather than problems with particular teachers, or buildings, or programs. *See, e.g., Aristy-Farer*, 29 N.Y.3d at 510 (NY 2017) (noting that they have "rejected … claims premised on failures in individual schools noting the importance of pleading specific 'district-wide' failures"); *N.Y. Civ. Liberties Union*, 4 N.Y.3d at 181 (rejecting claims premised on individual schools that "do not allege any district-wide failure").  The allegations here that certain buildings have internet connectivity problems are insufficient to state a claim, which requires a district-wide pleading. *Id. Finally*, on the facts, it is clear that Defendants' efforts of providing iPads, with unlimited cell service, WiFi installation, access to Learning Bridges, and individualized learning plans during this temporary, emergency situation arising out of the COVID-19 pandemic suffice to defeat any claims brought by Plaintiffs.

### B.  Plaintiffs' Claims Under the McKinney-Vento Act and New York State Education Law § 3209 Also Fail to State a Claim

 Plaintiffs fail to state a claim pursuant to the McKinney-Vento Act or New York State Education Law § 3209 because Plaintiffs do not, and cannot, point to anything in either statute that could plausibly be interpreted to require Defendants to install WiFi in all shelters, let alone do so, in a severely abbreviated timeframe, during the COVID-19 pandemic.

The McKinney-Vento Act and the New York Education Law § 3209 create a regulatory scheme through which funds are granted by the federal and state governments to local education organizations (LEO) in order to meet the purposes of Act. *See* 42 U.S.C. § 11432-33; NY CLS Educ § 3209.  The McKinney-Vento Act was enacted to "ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education, … as provided to other children and youths." 42 U.S.C. § 11431. "New York Education Law § 3209 incorporates the requirements of the McKinney-Vento Act and sets forth the provisions for the education of homeless children within the state." *N.J. v. New York*, 872 F.Supp. 2d 204, 210 (E.D.N.Y. 2011).

While some courts have held that McKinney-Vento creates a private right of action enforceable through 42 U.S.C. § 1983 in certain limited circumstances, *see Nat'l Law Ctr. On Homelessness & Poverty v. New York*, 224 F.R.D. 314, 321 (E.D.N.Y. 2004), no court has held that a plaintiff's rights under either statute extends beyond certain specific statutory rights to select among the mandated choices for enrollment or the services guaranteed by the statutes, such as transportation to school. *See, e.g., N.J.*, 872 F.Supp. 2d at 207-08 (student was denied enrollment because the LEO determined they did not fit the statutory definition of "homeless"); *G.S. v. Rose Tree Media Sch. Dist.*, 914 F.3d 206 (3d Cir. 2018) (LEO disputed student's eligibility for enrollment on multiple grounds); *D.C. v. Wallingforn-Swarthmore Sch. Dist.*, 2018 U.S. Dist. LEXIS 140259, *2-19 (E.D.Pa. 2018) (student was denied enrollment because the LEO determined they did not fit the statutory definition of "homeless"); *Nat'l Law Ctr. On Homelessness & Poverty*, 224 F.R.D. at 317, 321 (allowing plaintiffs to move forward on multiple claims, including seeking enrollment and transportation). Plaintiffs' claim that these

statutes require Defendants to install WiFi in all shelter buildings by January 4, 2021 is completely untethered to this caselaw.

Plaintiffs' reliance on New York Education Law § 3209(6)(b), which requires LEOs to "review and revise any local regulations, policies or practices that may act as barriers to the enrollment or attendance of homeless children in school or their receipt of comparable services," is unavailing.  The provision places no obligation on local education organizations to guarantee a particular accommodation at the parents' request when there may be multiple ways to ensure compliance with the state mandates. *See also* 42 U.S.C. § 11431.  In any case, as Plaintiffs themselves concede, Defendants' policy has been to enable students in shelter to participate in remote learning by providing "over 300,000 devices to New York City students who did not have a device at home," including all students residing in shelters, and to contract "to equip the devices with cellular plans that would enable them to connect to the internet." Compl. ¶¶ 37-38.  Plainly, Defendants do not have any policy or practice in place that "acts as a barrier to the enrollment or attendance of homeless children in school."  Plaintiffs assertion that the obligation in New York Education Law § 3209(7) to provide "indigent children" with "other necessaries" to enable them to attend school, requires Defendants to install WiFi at over 200 shelters in 30 days strains credulity.  There is no case that supports such an incredible assertion and Plaintiffs do not cite any.[5]

---

[5] To the extent Plaintiffs also rely on 42 U.S.C. § 11431(2), Plaintiffs claim must fail because that provision places obligations on a state education agency.  In any case, Defendants provided all students attending New York City public schools, regardless of where they reside, with internet access by delivering iPads enabled with unlimited cellular data.

### C. Plaintiffs' Equal Protection Clause Fails As a Matter of Law

The Equal Protection Clause of the Fourteenth Amendment provides that "no state shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV. The Supreme Court has long held: "Unless governmental action provokes 'strict judicial scrutiny' because it interferes with a 'fundamental right' or discriminates against a 'suspect class,' it will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose." *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457-58 (1988); *see also Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012). Here, Plaintiffs have identified neither violations of a fundamental right nor a suspect classification.

No constitutionally-protected fundamental right to an education exists under federal law. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 40 (1973); *Kadrmas*, 487 U.S. at 458 ("[n]or have we accepted the proposition that education is a "fundamental right" . . . which should trigger strict scrutiny"); *Manbeck v. Katonah-Lewisboro Sch. Dist.*, 435 F. Supp. 2d 273, 276 n.2 (S.D.N.Y. 2006) ("there is no fundamental right to education" under the Fourteenth Amendment in the context of equal protection); *Turner v. E. Meadow Sch. Dist.*, No. 07-CV-4318 (JS)(AKT), 2009 U.S. Dist. LEXIS 29524, at *5 (E.D.N.Y. Mar. 31, 2009) ("Long-standing precedent unambiguously states that education is not a fundamental right.").

Plaintiffs point to *Plyler v. Doe*, 457 U.S. 202, 216-17 (1982) and *Nat'l Law Ctr. on Homelessness & Poverty v. New York*, 224 F.R.D. 314, 319 (E.D.N.Y. 2004) for the proposition that a heightened standard of review, not rational basis, applies. Both cases are inapplicable. A heightened standard of review was applied in *Plyler* and *Nat'l Law Ctr.* because

the government was completely withholding school enrollment and/or transportation for a class of children to penalize those children for the acts of their parents over whom the children had no control. The Supreme Court has limited *Plyler* to the unique circumstances of that case, where a Texas statute withheld all state funds for educating children not "legally admitted" into the United States and authorized denying enrollment to that class of children. *Kadrmas*, 487 U.S. at 459 ("We have not extended this holding beyond the 'unique circumstances.'"). In *Kadrmas*, the Supreme Court reaffirmed that it has never accepted the proposition that education is a "fundamental right," and, unless the government is completely denying education to penalize children for the conduct of their parents as in *Plyler*, rational basis review is the appropriate standard. 487 U.S. at 458 (denying a student access to the school bus because her parents would not agree to pay the user fee). Here, Defendants have not denied enrollment or transportation to Plaintiffs' children and clearly are not trying to penalize them. Unlike in *Plyler* and *Nat'l Law Ctr.*, Defendants have provided students in shelter, including the Plaintiffs' children, with internet-enabled iPads carrying unlimited wireless data to enhance their cellular service, and has contracted to reconstruct entire building infrastructures for hundreds of units to install WiFi for them.

Additionally, where no classification exists, there is no equal protection claim. *Franza v. Carey*, 518 F. Supp. 324, 330 n.10. (S.D.N.Y. 1981) (where a statute "creates no classification among retailers and applies equally to all . . . there is no basis for plaintiffs' equal protection . . . challenge"); *Fullwood v. Vosper*, No. 9:99CV1586, 2007 U.S. Dist. LEXIS 1840, at *18 (N.D.N.Y. Jan. 9, 2007) (where plaintiff "not only fails to identify a protected classification, [but] fails to identify any classification . . . [the] complaint does not state a cognizable equal protection claim . . . [and] this claim will be dismissed"). Here, Defendants

have made no classifications, but rather are providing devices with improved cellular service for internet, and are working to provide WiFi to all shelter units with school aged children. The fact that cellular service is spotty in some parts of New York City does not constitute a classification.

Even if Plaintiffs have alleged a classification, they have failed to identify a suspect class. Homelessness is not a suspect classification. *Kadrmas*, 487 U.S. at 458 (declining to define suspect classification based on wealth); *Wallace v. New York*, 40 F. Supp. 3d 278, 330 (E.D.N.Y. 2014) ("*homeless* sex offenders[]do not constitute a suspect classification") (emphasis in original); *see also Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000) ("Homeless persons are not a suspect class"); *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1269 n.36 (3d Cir. 1992) (same). Thus, as long as Defendants' actions have a rational basis, their actions do not violate the Equal Protection Clause. *Id.*

Here, in the face of a public health crisis unparalleled in recent history, Defendants' actions were plainly rational and reasonable. Defendants' swift move to shift 1.1 million students from in-person to remote learning in response to the COVID-19 outbreak certainly had a rational basis. *See McCarthy v. Cuomo*, No. 20-cv-2124 (ARR), 2020 U.S. Dist. LEXIS 107195, at *15 (E.D.N.Y. June 18, 2020) ("Given the seriousness of the COVID-19 pandemic, [the court found] it exceedingly unlikely that plaintiffs will be able to demonstrate that the [governor's executive orders] do not have a rational basis"). So does Defendants' actions of distributing tens of thousands of iPads with cellular service and unlimited wireless data to shelter students, testing their cellular signals, swapping T-Mobile service for Verizon service for any student struggling with internet connectivity, and working on an aggressive schedule to get WiFi installed in all shelter units. All these actions are to assist students in shelters to engage in remote learning. Plaintiffs are unlikely to demonstrate that Defendants'

actions were irrational, or constituted an Equal Protection Clause violation, or indeed, are anything other than a reasonable and good-faith approach to providing remote learning.

### III.      PLAINTIFFS HAVE FAILED TO ESTABLISH IRREPARABLE HARM

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citations and quotation marks omitted). "Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012). In addition, if a party is seeking a mandatory preliminary injunction that alters the status quo by commanding a positive act, or if the injunction would provide the moving party with substantially all the relief sought and that relief could not be undone even if the moving party ultimately loses on the merits, the moving party must make a "strong showing" of irreparable harm. *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015); *Doe v. N.Y. Univ.*, 666 F.2d 761, 773 (2d Cir. 1981).

Plaintiffs claim irreparable injury because the shelters in which they reside lack WiFi. However, fundamentally, any educational harm resulting from intermittent internet connectivity is not caused by Defendants, but rather is the consequence of the temporary emergency and monumental shift in public school education caused by the COVID-19 pandemic, the reliability of data plan service, and the location and construction of shelter buildings. *See Facts*, Section I, II, III. As such, the causal connection alleged by Plaintiffs is insufficient to justify a preliminary injunction. *See Diversified Mortg. Inv'rs v. U.S. Life Ins. Co. of New York*, 544 F.2d 571, 576 (2d Cir. 1976) (overturning  grant of a preliminary injunction where

insufficient evidence of "any irreparable harm which is causally related to [Defendant's conduct]"); *TRT Leaseco, LLC v. DGI-BNSF Corp.*, No. 20-cv-5257, 2020 U.S. Dist. LEXIS 168768, at \*4 (S.D.N.Y. Sept. 15, 2020) ("a plaintiff may be irreparably harmed by all sorts of things, but the irreparable harm considered by the court must be caused by the conduct in dispute") (quoting *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011)).

In addition, a WiFi connection is not the sole method of providing remote learning, and Plaintiffs have not shown that the absence of a WiFi connection is the equivalent *per se* of irreparable injury. Indeed, the facts establish that Defendants have made significant efforts to provide Plaintiffs with other means of internet access for their children.[6]  In Spring 2020, DOE provided all three plaintiffs with iPads equipped with T-Mobile cellular service and unlimited wireless data. *See Facts*, Section IV.   DOE has also provided two of the three plaintiffs' families with iPads with Verizon service after DOE's technical teams confirmed that all of the remote learning apps performed satisfactorily and better using Verizon service.  In addition to the cellular data enabled iPads, one of the Plaintiffs currently resides in a shelter that provides WiFi internet acces*s*, and another plaintiff resides in a shelter where Defendants are currently installing WiFi. *See Facts*, Section IV.  Moreover, DOE has provided and continues to provide particular instructional supports for students in temporary housing who may not have a

---

[6] Plaintiffs seek to establish as a matter of law that intermittent connectivity interruptions constitute irreparable harm to homeless students by relying on a series of cases that are clearly distinguishable from the facts here.  Pl. Mem. at 10, citing *Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist.*, 689 F. Supp. 197, 204 (S.D.N.Y. 1998) (twenty-year-old student, classified as emotionally disabled, received no instruction at all after he was *totally excluded* from his educational setting); *N.J. v. New York*, 872 F. Supp. 2d 204, 214 (E.D.N.Y. 2011) (homeless children were irreparably injured by disenrollment from original schools); and *V.W. v. Conway*, 236 F. Supp. 3d 554, 588-89 (N.D.N.Y. 2017) (juveniles detained in Onondaga County Justice Center suffered irreparable harm when they were not provided educational services while *routinely being subjected to solitary confinement*.).

device, such as distributing paper instructional packets. *See Facts*, Section II.C.  If connectivity

issues cannot be resolved, the City and DOE will offer the option of attending Learning Bridges

to preschool to 8th grade students residing in shelters designated as high priority based on the

number of reported problems with connectivity. For those students that do not want to or are not

able to attend Learning Bridges, DOE will ensure each student is contacted and that the students'

school has an individualized plan in place to meet the instructional needs of that student. *See*

*Facts*, Section II.C.

IV.   **THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTIVE RELIEF**

The balance of the equities also tips in Defendants' favor. Although not statutorily

or constitutionally required, Defendants have gone to great lengths to secure technology and

internet access for Plaintiffs and students in shelter, including internet-enabled iPads, two

cellular service providers, and ongoing, robust efforts to install WiFi in individual apartments at

an extremely aggressive pace.  *See Facts*, Section IIA-B, III, IV.  In addition, as discussed above,

Defendants will also offer instructional alternatives for students in priority shelters, including

attending Learning Bridges locations with WiFi connection. For students that continue to

experience difficulty connecting to the internet on their DOE-issued device even with the swap

to Verizon service and are not able or do not want to participate in Learning Bridges, DOE will

ensure each student is contacted and that the students' school has a customized individualized

educational plan.  *See Facts*, Section IIC. Most important, however, is the fact that it is not

possible to install WiFi in individual apartments over 200 shelter buildings by January 4, 2021.

McGrath ¶ 21.  A  project of this nature would ordinarily be expected to take 2 years, if not

longer.  *See Facts*, Section III.

Defendants would of course prefer that the connectivity problems as described in the Plaintiffs' declarations did not exist.  However, in balancing the equities, the Court should consider that Defendants are currently installing WiFi access at the shelter in which Plaintiff O.M. resides; that Plaintiff M.M. resides at a shelter which has internet pods/extenders in the ceilings on every floor that extends the WiFi to every room; and that Plaintiff E.G. received two Verizon enabled iPads for her children on December 1, 2020. Balancing the equities and the public interest here favors denial of plaintiffs' extraordinary request for a completely unfeasible preliminary injunction in the face of steady progress by Defendants.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully requests that this Court deny Plaintiffs' motion for a preliminary injunction.

Dated:      New York, New York
            December 4, 2020

                              Respectfully submitted,

                              JAMES E. JOHNSON
                              Corporation Counsel of the City of New York
                              Counsel for City Defendants
                              100 Church Street
                              New York, New York 10007
                              (212) 356-2273


                              By:     _____/s/_____
                                      Sabita Krishnan
                                      Hope Lu
                                      Joseph Pepe
                                      Gavin Mackie
                                      Assistant Corporation Counsels